**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| JANE DOE, | | |
| | *Plaintiff*, | Civil Action No. |
| v. | | |
| DONALD J. TRUMP, et al | | |
| | *Defendants*. | Judge |
| | | Magistrate Judge |

## <u>EXHIBITS TO COMPLAINT FOR INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT</u>

| Exh. A | Order of the Immigration Judge dated June 10, 2025 |
|---|---|
| Exh. B | Sworn Statement by ▮▮▮▮▮ dated July 9, 2025 |
| Exh. C | Sanctuary for Families Letter sent to ICE on June 27, 2025 |
| Exh. D | Sanctuary for Families Letter sent to ICE on August 11, 2025 |
| Exh. E | Sanctuary for Families Letter sent to ICE October 6, 2025 |
| Exh. F | Affirmation by Emlyn Medalla |
| Exh. G | Affirmation by Whitney Hood |
| Exh. H | Making America Safe Again |
| Exh. I | Memo by Todd M. Lyons, Acting Director, to All ICE Employees, Re: Third Country Removals Following the Supreme Court's Order in *Dep't of Homeland Sec. v. D.V.D.*, 145 S.Ct. 2153 (2025), dated July 9, 2025 |
| Exh. J | Memo from Bo Cooper, General Counsel, U.S. Dep't of Justice, Re Detention and Release during the Removal Period of Aliens Granted Withholding or Deferral of Removal, dated Apr. 21, 2000 |
| Exh. K | Copy of ICE Flight Monitor, @ICEFlightM X account, which tracks ICE deportation flights and which, at the time of filing, shows that the Flight departed from Alexandria, LA has not reached all its final destinations |

# EXHIBIT A

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
830 PINEHILL ROAD
JENA, LA  71342

[REDACTED]

180 PINE BAYOU CIR
RICHWOOD, LA  71202

In the matter of                    File A [REDACTED]        DATE: Jun 11, 2025
[REDACTED]

__ Unable to forward - No address provided.

_X_ **Attached is a copy of the decision of the Immigration Judge. This decision
is final unless an appeal is filed with the Board of Immigration Appeals
within 30 calendar days of the date of the mailing of this written decision.
See the enclosed forms and instructions for properly preparing your appeal.
Your notice of appeal, attached documents, and fee or fee waiver request
must be mailed to:        Board of Immigration Appeals
                          Office of the Clerk
                          5107 Leesburg Pike, Suite 2000
                          Falls Church, VA 22041**

__ Attached is a copy of the decision of the immigration judge as the result
of your Failure to Appear at your scheduled deportation or removal hearing.
This decision is final unless a Motion to Reopen is filed in accordance
with Section 242b(c)(3) of the Immigration and Nationality Act, 8 U.S.C. §
1252b(c)(3) in deportation proceedings or section 240(b)(5)(C), 8 U.S.C. §
1229a(b)(5)(C) in removal proceedings.  If you file a motion to reopen, your
motion must be filed with this court:
                          IMMIGRATION COURT
                          830 PINEHILL ROAD
                          JENA, LA  71342

__ Attached is a copy of the decision of the immigration judge relating to a
Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. §
1208.31(g)(1), no administrative appeal is available. However, you may file
a petition for review within 30 days with the appropriate Circuit Court of
Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA §242.

__ Attached is a copy of the decision of the immigration judge relating to a
Credible Fear Review. This is a final order. No appeal is available.

_X_ **Other: ADDENDUM OF LAW, APPEAL PACKET, AND DOSHR ATTACHED**

                                        VS
                              _____
                              COURT CLERK
                              IMMIGRATION COURT                    FF

        cc: CHIEF COUNSEL
            830 Pinehill Road
            Jena, LA,  71342



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**LASALLE IMMIGRATION COURT**

Respondent Name:

To:

████████████████████████

████████████████████████

180 PINE BAYOU CIR
RICHWOOD, LA 71202

A-Number:

████████████

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
06/10/2025

## ORDER OF THE IMMIGRATION JUDGE

☑ This is a summary of the oral decision entered on 06/10/2025. The oral decision in this case is the official opinion, and the immigration court issued this summary for the convenience of the parties.

☐ Both parties waived the issuance of a formal oral decision in this proceeding.

### I.    Removability

The immigration court found Respondent ☑ removable ☐ inadmissible under the following Section(s) of the Immigration and Nationality Act (INA or Act): 212(a)(6)(A)(i).

The immigration court found Respondent ☑ not removable ☐ not inadmissible under the following Section(s) of the Act: 212(a)(7)(A)(i)(I) - withdrawn by DHS on April 1, 2025.

### II.    Applications for Relief

Respondent's application for:

A.  Asylum/Withholding/Convention Against Torture

☑ Asylum was ☐ granted ☑ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☑ Withholding of Removal under INA § 241(b)(3) was ☑ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☑ Withholding of Removal under the Convention Against Torture was ☐ granted ☐ denied ☐ withdrawn with prejudice ☑ withdrawn without prejudice

☐ Deferral of Removal under the Convention Against Torture was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Respondent knowingly filed a frivolous application for asylum after notice of the consequences. *See* INA § 208(d)(6); 8 C.F.R. §1208.20

B.  Cancellation of Removal

☐ Cancellation of Removal for Lawful Permanent Residents under <u>INA § 240A(a)</u> was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Cancellation of Removal for Nonpermanent Residents under <u>INA § 240A(b)(1)</u> was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Special Rule Cancellation of Removal under <u>INA § 240A(b)(2)</u> was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

C. Waiver

☐ A waiver under INA § was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

D. Adjustment of Status

☐ Adjustment of Status under INA § was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

E. Other

The Respondent's application for Withholding of Removal under the Convention Against Torture was denied as moot

**III.    Voluntary Departure**

☐ Respondent's application for ☐ pre-conclusion voluntary departure under INA § 240B(a) ☐ post-conclusion voluntary departure under INA § 240B(b) was ☐ denied.

☐ Respondent's application for ☐ pre-conclusion voluntary departure under INA § 240B(a) ☐ post-conclusion voluntary departure under INA § 240B(b) was ☐ granted, and Respondent is ordered to depart by           . The respondent must post a $ bond with DHS within five business days of this order. Failure to post the bond as required or to depart by the required date will result in an alternate order of removal to taking effect immediately.

☐ The respondent is subject to the following conditions to ensure his or her timely departure from the United States:

☐ Further information regarding voluntary departure has been added to the record.

☐ Respondent was advised of the limitation on discretionary relief, the consequences for failure to depart as ordered, the bond posting requirements, and the consequences of filing a post-order motion to reopen or reconsider:

If Respondent fails to voluntarily depart within the time specified or any extensions granted by the DHS, Respondent shall be subject to a civil monetary penalty as provided by relevant statute, regulation, and policy. *See* INA § 240B(d)(1). The immigration court has set
☐ the presumptive civil monetary penalty amount of $3,000.00 USD
☐ $ USD instead of the presumptive amount.
If Respondent fails to voluntarily depart within the time specified, the alternate order of removal shall automatically take effect, and Respondent shall be ineligible, for a period of 10 years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Act, to include cancellation of removal, adjustment of status, registry, or change of

nonimmigrant status. *Id.* If Respondent files a motion to reopen or reconsider prior to the expiration of the voluntary departure period set forth above, the grant of voluntary departure is automatically terminated; the period allowed for voluntary departure is not stayed, tolled, or extended. If the grant of voluntary departure is automatically terminated upon the filing of such a motion, the penalties for failure to depart under section 240B(d) of the Act shall not apply.

If Respondent appeals this decision, Respondent must provide to the Board of Immigration Appeals (Board), within 30 days of filing an appeal, sufficient proof of having posted the voluntary departure bond. The Board will not reinstate the voluntary departure period in its final order if Respondent does not submit timely proof to the Board that the voluntary departure bond has been posted.

In the case of conversion to a removal order where the alternate order of removal immediately takes effect, where Respondent willfully fails or refuses to depart from the United States pursuant to the order of removal, to make timely application in good faith for travel or other documents necessary to depart the United States, to present himself or herself at the time and place required for removal by the DHS, or conspires to or takes any action designed to prevent or hamper Respondent's departure pursuant to the order of removal, Respondent may be subject to a civil monetary penalty for each day Respondent is in violation. If Respondent is removable pursuant to INA § 237(a), then he or she shall be further fined or imprisoned for up to 10 years.

## IV.    Removal

☑    Respondent was ordered removed to DEMOCRATIC REPUBLIC OF CONGO.

☐    In the alternative, Respondent was ordered removed to

☐    Respondent was advised of the penalties for failure to depart pursuant to the removal order:

> If Respondent is subject to a final order of removal and willfully fails or refuses to depart from the United States pursuant to the order, to make timely application in good faith for travel or other documents necessary to depart the United States, to present himself or herself at the time and place required for removal by the DHS, or conspires to or takes any action designed to prevent or hamper Respondent's departure pursuant to the order of removal, Respondent may be subject to a civil monetary penalty for each day Respondent is in violation. If Respondent is removable pursuant to INA § 237(a), then he or she shall be further fined or imprisoned for up to 10 years.

## V.    Other

☐ Proceedings were ☐ dismissed ☐ terminated with prejudice ☐ terminated without prejudice ☐ administratively closed.

☐ Respondent's status was rescinded under INA § 246.

☑ Other:

> The docketed hearing location is at the Jena Immigration Court in Louisiana. The Immigration Judge is physically located in Richmond, VA. As the Richmond Immigration Adjudication Center is located in the jurisdiction of the United States Court of Appeals for the Fourth Circuit, the Court applies Fourth Circuit precedent to these proceedings. Herrera-Alcala v. Garland, 39 F.4th 233, 242 (4th Cir. 2022).

An addendum, stating the standards of law and burdens of proof relevant to these issues will be placed in the record of proceedings. That addendum is hereby adopted and incorporated into this decision by reference.

Immigration Judge: Palmer, Brian 06/10/2025

Appeal:    Department of Homeland Security: ☒ waived  ☐ reserved
           Respondent:                      ☐ waived  ☒ reserved
Appeal Due: 07/10/2025

**Certificate of Service**

This document was served:
Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable
To: [ ] Noncitizen | [ M ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS
Respondent Name : ████████████████████ A-Number : ██████████
Riders:
Date: 06/11/2025 By: Victoria Sparks, Court Staff

EXHIBIT B

**Immigration Customs and Enforcement,**
**Department of Homeland Security**

---

Sworn Statement of ██████████
██████ on her entry to the United States

**Sworn Statement of** ████████

---

I ██████████████, swear the following:

1. My name is ██████████████. I was born ██████████████ in the Democratic Republic of the Congo. I am submitting this affidavit to request parole into the United States.

2. I am a victim of human trafficking by my father's friend, ██████████████. My family sold me to be his sixth "wife." I was only fourteen years old when ██████ took me away from my family as collateral after he loaned my father money and my father was unable to repay him. He violently raped me, calling me a "baby machine" and constantly said that he "paid a lot of money" for me. I was kept like a hostage, and brutalized for years. I managed to escape with the help of my family, but ██████ used his extensive resources to hunt me. He murdered my father right in front of me and burned our house down. My mother, brother, children and I were able to escape, but my mother died while trying to hide my children.

3. I was granted Withholding of Removal after establishing that it is more likely than not that I would be persecuted if removed to the Democratic Republic of the Congo. I am grateful for this protection and I am hoping to be released from ICE detention. This affidavit describes the experiences I suffered at the hands of my traffickers, the trauma I continue to endure, and the fear of persecution I would suffer if forced to leave the United States.

**Granted Withholding of Removal based on Fear of Persecution in DRC**

4. The immigration judge already determined that it is more likely than not that I would be persecuted if I were removed to the Democratic Republic of the Congo.

5. Under US immigration laws, I understand that it was established that it is more likely than not that I will be persecuted because I was sold to ██████████ as repayment for a debt on my father's loan. ██████ took me from my family when I was 14 years-old and forced me to live in a compound with his five wives and many of his children. I experienced abuse from ██████ and his family. ██████ raped me every other night since I was 14. When he was away, his adult sons raped me, too.

6. ███████ is a very powerful man in a high political position in the Democratic Republic of Congo. He is the █████████████████████████████████████████████████ ████ He even employs police officer-bodyguards that do his bidding.

7. My mother finally helped me escape. That same night, ████████ came to my family's home with two police officers that served as his bodyguards and beat me, my father, and my brother while my mother was in church with my children. ████████ ordered his police officer-bodyguard to shoot my father. They killed my father right in front of me.

8. We tried to run to the police, and to other people in our community for help. Everyone refused to help us. They all said that they were scared ████████ would come after them and their families and kill them if they helped us. My family couldn't go home that night and we all went into hiding. While we hid, ████████ and his police officer-bodyguards returned to my home and burnt it to the ground.

9. ███████ power and influence is strong, especially in the Democratic Republic of the Congo. He owns large stores and a school, he is connected to different foundations, politicians, and law enforcement. His primary business is loaning money to people and taking their possessions as collateral. From politicians to local community members, ████████ has people everywhere. Everyone reminded us of this when we begged for help. They were scared of ████████ would also come after their families, and they advised us to leave the country.

10. My brother's boss was brave enough to help us get travel documents and plane tickets to Brazil. I left with my brother on ██████████████████. I was relieved to escape but I was terrified for my mother and my kids. I lost contact with them and didn't know where they were. I didn't want to leave without them and my mom, but I had no choice.

**Persecution and Torture I will suffer if Deported to a Third Country**

11. When we arrived in Brazil, I thought I was finally safe. I couldn't even think about next steps because within an hour of arriving in Brazil, I received a message from ████████ on WhatsApp. I was terrified. ████████ never let me have a phone when I lived in his house, and my brother gave me a phone as we were fleeing. I don't know how ████████ got my WhatsApp information. ████████ told me he knew I was in Brazil, that he "had eyes everywhere" in Brazil that could find me and kill me and my brother. I threw out the phone and started running with my brother. We knew United States respected human rights, so we fled here in hopes of safety.

12. I will not be safe if I am removed to a third country. ████████ and his children frequently travel to Canada, Spain, the United Kingdom, France, and other countries. They have multiple businesses and hold political positions. They are able to get visas easily and often travel for periods of weeks to a month at a time. They travel to different countries like China to buy goods for their stores. ████████ children have even studied abroad in these countries. I believe ████████ also has children who live in Canada. When I saw ████████ text message in Brazil, I realized that the only place I could be safe is the United States.

**I will be able to be a productive neighbor and community member if released from ICE custody.**

13. I am grateful that the United States granted me Withholding of Removal in recognition of the past harm I experienced and the fear of future harm if returned to the Democratic Republic of the Congo. The United States is where I know I can be safe from my persecutor's reach. I fear that he will be able to travel to and hunt me down in a third country, like Spain or Canada.

14. Respectfully, I request to be released from ICE detention – I know that because ██████ political connections, power, and reach, as well as his children's' reach is expansive, I would not be safe in another country.

15. The United States is the safest country for me, where I have a ██████ in ██████ I have a very small family. I lost both my parents while trying to escape from ██████ I don't know where my siblings or my children are. The only family member I have is my cousin, ██████ who lives in ██████

16. ICE agents mentioned that I could be removed to Canada or Spain where I have no family and cannot speak Spanish. I have no status in these countries, no ability to work in these countries, and no way to support myself. As of this affidavit, neither I nor my attorney has received written notice reflecting what ICE agents have told me. I must be given notice and meaningful opportunity to show reasonable fear and explain further why I would suffer persecution or torture if removed to Canada or Spain.

17. Additionally, I have access to legal services in the United States that I would lose if I were sent to a different country. I have already been granted by an immigration judge Withholding of Removal and am seeking work authorization so that I may work, support myself, pay American taxes, and live as a productive citizen and Christian neighbor.



Dated: 07|09|2025

EXHIBIT C



CBWLS
30 Wall Street, 8th Fl.
New York, NY 10005
Tel: 212.349.6009
Fax: 212.566.0344
sanctuaryforfamilies.org

**Hon. Judy Harris Kluger**
*Chief Executive Officer*

**BOARD OF DIRECTORS**

**Michèle O. Penzer**
*President*

**Jamila Abston Mayfield**
*Vice President*

**Anita Kawatra**
*Vice President*

**Katharine Bieber Ogg**
*Vice President & Secretary*

**Francesca Odell**
*Treasurer*

**Nefertiti J. Alexander**
**Greg Baker**
**Flore E. Baptiste**
**Garrard R. Beeney**
**Kara M. Bellew**
**Ingrid Bilowich-von Ahn**
**Jeannette Boot**
**Diana Brummer**
**Iris Chiu**
**Maura J. Clark**
**Mylan L. Denerstein**
**Michele Dinn**
**Meena Flynn**
**Claudia Hammerman**
**Nyesha Hightower**
**Ida Hoghooghi**
**Sunita Jaffrey**
**Abby F. Kohnstamm**
**Sunita Koshy**
**Ted Lazarus**
**Maria Meneses**
**Ana L. Oliveira**
**Stacey J. Rappaport**
**Molly G. Snyder**
**Timothy J. White**
**Alita T. Wingfield**

**PAST PRESIDENTS**

**Sarah Burke***
**Catherine Douglass**
**Stephanie Ferdman**
**William F. Gorin**
**Theresa Ann Havell***
**John R. Horan**
**Mary Ann Mailman**
**Loretta McCarthy**
**Denis J. McInerney**
**Catherine Woodman**

*\*in memoriam*

June 27, 2025

**Re:** ██████████████████████████

To Whom It May Concern:

I write this letter as the attorney of Ms. ████████ ████████ ████████ (A#██████████  I am a Staff Attorney at Sanctuary for Families, a nonprofit, a provider of legal and clinical services for victims of gender violence and human trafficking.

This letter is to inform that Ms. ████████████████████ is represented.

Ms. ████████████████████ was granted Withholding of Removal by an Immigration Judge on June 10, 2025. I understand that ICE is investigating a third-country removal.  Respectfully, I request the status of ICE's third country determination.

DHS may only seek to deport a noncitizen to a country to which they have no citizenship - i.e., a third country - if it is "impracticable, inadvisable, or impossible to remove" them to "each country [designated for removal.]" 8 U.S.C. § 1231 (b)(2)(A)-(E). Through her grant of Withholding, Ms. ████ may not be removed to the Democratic Republic of the Congo. No other country was designated during removal proceedings. **Notice and opportunity to apply for protection are required prior to removal to a third country.** DHS and ICE must provide noncitizens with adequate notice and a meaningful opportunity to present a fear-based claim prior to removal to a third country. Ms. ████████████ and I, as her counsel, are entitled to written notice of the new country of removal. Ms. ████ is allowed up to ten days to contact counsel or family, inform herself of the conditions in the newly designated country and articulate a far, if any. If DHS determines the fear is reasonable, it must open removal proceedings to allow an immigration judge to adjudicate the claim. If not, Ms. ████ has up to 15 days to move to reopen proceedings herself to seek relief based on a fear of persecution or torture.

Ms. ████████████████ has been told that ICE is considering Canada and Spain as third countries for removal. Ms. ████ has reasonable fear of persecution or torture if removed to Canada or Spain. As a well-connected and well-traveled politician from the Democratic Republic of the Congo, Ms. ████ persecutor has already demonstrated that he can find her in a third country. In fact, when Ms. ████ originally fled to Brazil, her persecutor found and threatened her within an hour of her arrival in Brazil. In his threat, her persecutor reminded her of his international reach and told her he knew people "everywhere" that "could find her." He threatened to kill her. Her persecutor's children also committed violence



CBWLS
30 Wall Street, 8th Fl.
New York, NY 10005
Tel: 212.349.6009
Fax: 212.566.0344
sanctuaryforfamilies.org

against Ms. ███████ and travel to Canada and Spain regularly. Ms. ███████ ███████████████ has expressed fear of persecution or torture if her persecutor or his children found her in Canada or Spain. More information about Ms. ███████ fear can be supplied at a later date.

Additionally, I write to inform you that while in ICE custody, Ms. ███████ ██████████████ has expressed medical concerns, sharing that she is experience sharp, intense stomach pains. She shared that she needs medical attention and has not received any. Under the Eighth Amendment, detainees have a right to get medical care. The Supreme Court explained that this is because "[a]n inmate must rely on prison authorities to treat [her] medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v Gamble*, 429 U.S. 97, 103 (1976). ICE has a duty to provide medical care to Ms. ██████ ██████████ ████████.

Therefore, we respectfully request that ICE provide the necessary medical attention to Ms. ████████████████████████, and share the current status on seeking to remove my client to a third country

I may be contacted at ████████████████████████████████

Best,

Emlyn Medalla, Esq.
Staff Attorney
Anti-Trafficking Initiative

Hon. Judy Harris Kluger
*Chief Executive Officer*

**BOARD OF DIRECTORS**

Michèle O. Penzer
*President*

Jamila Abston Mayfield
*Vice President*

Anita Kawatra
*Vice President*

Katharine Bieber Ogg
*Vice President & Secretary*

Francesca Odell
*Treasurer*

Nefertiti J. Alexander
Greg Baker
Flore E. Baptiste
Garrard R. Beeney
Kara M. Bellew
Ingrid Bilowich-von Ahn
Jeannette Boot
Diana Brummer
Iris Chiu
Maura J. Clark
Mylan L. Denerstein
Michele Dinn
Meena Flynn
Claudia Hammerman
Nyesha Hightower
Ida Hoghooghi
Sunita Jaffrey
Abby F. Kohnstamm
Sunita Koshy
Ted Lazarus
Maria Meneses
Ana L. Oliveira
Stacey J. Rappaport
Molly G. Snyder
Timothy J. White
Alita T. Wingfield

**PAST PRESIDENTS**

Sarah Burke*
Catherine Douglass
Stephanie Ferdman
William F. Gorin
Theresa Ann Havell*
John R. Horan
Mary Ann Mailman
Loretta McCarthy
Denis J. McInerney
Catherine Woodman

*in memoriam*

# EXHIBIT D



CBWLS
30 Wall Street, 8th Fl.
New York, NY 10005
Tel: 212.349.6009
Fax: 212.566.0344
sanctuaryforfamilies.org

**Hon. Judy Harris Kluger**
*Chief Executive Officer*

**BOARD OF DIRECTORS**

**Michèle O. Penzer**
*President*

**Jamila Abston Mayfield**
*Vice President*

**Anita Kawatra**
*Vice President*

**Katharine Bieber Ogg**
*Vice President & Secretary*

**Francesca Odell**
*Treasurer*

**Nefertiti J. Alexander**
**Greg Baker**
**Flore E. Baptiste**
**Garrard R. Beeney**
**Kara M. Bellew**
**Ingrid Bilowich-von Ahn**
**Jeannette Boot**
**Diana Brummer**
**Iris Chiu**
**Maura J. Clark**
**Mylan L. Denerstein**
**Michele Dinn**
**Meena Flynn**
**Claudia Hammerman**
**Nyesha Hightower**
**Ida Hoghooghi**
**Sunita Jaffrey**
**Abby F. Kohnstamm**
**Sunita Koshy**
**Ted Lazarus**
**Maria Meneses**
**Ana L. Oliveira**
**Stacey J. Rappaport**
**Molly G. Snyder**
**Timothy J. White**
**Alita T. Wingfield**

**PAST PRESIDENTS**

**Sarah Burke***
**Catherine Douglass**
**Stephanie Ferdman**
**William F. Gorin**
**Theresa Ann Havell***
**John R. Horan**
**Mary Ann Mailman**
**Loretta McCarthy**
**Denis J. McInerney**
**Catherine Woodman**

*\*in memoriam*

August 11, 2025

***Re:*** ███████████████████████████

To Whom It May Concern:

I write this letter as the attorney of Ms. ████████████████████ (A#███████████).  This letter is in response to ICE's submission of I-241 for Request for Acceptance of Alien to Guatemalan Representatives.

Ms. ███████████████████ has reasonable fear of persecution or torture if removed to Guatemala. Ms. ████████ persecutor is a well-connected and well-traveled politician from the Democratic Republic of the Congo and has already demonstrated that he can find her in a third country. In fact, when Ms. ████████ originally fled to Brazil, her persecutor found and threatened her within an hour of her arrival in Brazil. In his threat, her persecutor reminded her of his international reach and told her he knew people "everywhere" that "could find her." He threatened to kill her. Ms. ████████ persecutor would be able to find her in Guatemala.

Additionally, Ms. ████████ previously entered Guatemala after fleeing the Democratic Republic of the Congo and Brazil. Ms. ████████ searched for safety in Guatemala and failed. In addition to her persecutor's ability to find her in Guatemala and her inability to speak Spanish, Ms. ████████ has a fear of persecution in Guatemala based on her identity as an African woman. As a survivor of trafficking, Ms. ████████ is likely to be retrafficked in Guatemala where traffickers exploit migrants and asylum seekers. As outlined in the U.S. State Department's Trafficking in Persons report of Guatemala, Ms. ████████ would fall victim to traffickers who target the most vulnerable migrants, including members of marginalized populations that frequently experience discrimination from authorities. Traffickers in Guatemala have exploited victims in migrant shelters. Ms. ████████ fled Guatemala for the United States in hopes of safety.

Ms. ████████████████ was granted Withholding of Removal by an Immigration Judge on June 10, 2025. Though it has been 62 days since this grant, Ms. ████████ has been in detention since January of this year. Therefore, we respectfully request that ICE release Ms. ████████.



CBWLS
30 Wall Street, 8th Fl.
New York, NY 10005
Tel: 212.349.6009
Fax: 212.566.0344
sanctuaryforfamilies.org

I may be contacted at ███████████████████

Best,

Emlyn Medalla, Esq.
Staff Attorney
Anti-Trafficking Initiative

**Hon. Judy Harris Kluger**
*Chief Executive Officer*

**BOARD OF DIRECTORS**

**Michèle O. Penzer**
*President*

**Jamila Abston Mayfield**
*Vice President*

**Anita Kawatra**
*Vice President*

**Katharine Bieber Ogg**
*Vice President & Secretary*

**Francesca Odell**
*Treasurer*

**Nefertiti J. Alexander**
**Greg Baker**
**Flore E. Baptiste**
**Garrard R. Beeney**
**Kara M. Bellew**
**Ingrid Bilowich-von Ahn**
**Jeannette Boot**
**Diana Brummer**
**Iris Chiu**
**Maura J. Clark**
**Mylan L. Denerstein**
**Michele Dinn**
**Meena Flynn**
**Claudia Hammerman**
**Nyesha Hightower**
**Ida Hoghooghi**
**Sunita Jaffrey**
**Abby F. Kohnstamm**
**Sunita Koshy**
**Ted Lazarus**
**Maria Meneses**
**Ana L. Oliveira**
**Stacey J. Rappaport**
**Molly G. Snyder**
**Timothy J. White**
**Alita T. Wingfield**

**PAST PRESIDENTS**

**Sarah Burke***
**Catherine Douglass**
**Stephanie Ferdman**
**William F. Gorin**
**Theresa Ann Havell***
**John R. Horan**
**Mary Ann Mailman**
**Loretta McCarthy**
**Denis J. McInerney**
**Catherine Woodman**

*in memoriam*

An official website of the United States Government  _Here's how you know_

U.S. DEPARTMENT *of* STATE

**Home** > ... > Guatemala

# 2024 Trafficking in Persons Report: Guatemala

**IN THIS SECTION /
GUATEMALA (TIER 2)**

## GUATEMALA (Tier 2)

The Government of Guatemala does not fully meet the minimum standards for the elimination of trafficking but is making significant efforts to do so. The government demonstrated overall increasing efforts compared with the previous reporting period; therefore Guatemala remained on Tier 2. These efforts included identifying more victims, increasing the number of trafficking investigations and new prosecutions, opening new specialized criminal courts for trafficking and immigration crimes, enacting a new anti-trafficking action plan, and convicting the former head of the police's specialized anti-trafficking investigation unit for involvement with a sex trafficking ring. However, the government did not meet the minimum standards in several key areas. The convicted officer received an option to pay a fine in lieu of imprisonment, a penalty that was inadequate to deter corrupt officials from participating in or facilitating trafficking crimes. Courts convicted fewer traffickers and the government did not allocate sufficient funding for anti-trafficking law enforcement or victim services outside the capital. Adult victims had few shelter options.

## PRIORITIZED RECOMMENDATIONS:

Increase funding for victim protection, including government and NGO shelters and other service providers, and expand access to services for LGBTQI+, male, and/or adult victims. * Vigorously investigate and prosecute traffickers, including labor traffickers and complicit officials, and seek adequate penalties for convicted traffickers, which should involve significant prison terms. * Increase efforts to proactively identify trafficking victims, particularly among vulnerable populations, such as working children, migrants and returnees, individuals in commercial sex, children apprehended for illicit gang-related activities, and Cuban government-affiliated workers. * Ensure outreach efforts to vulnerable and underserved communities include access for victims and at-risk persons to file a complaint or receive services. * Amend the 2009 anti-trafficking law to include a definition of human trafficking consistent with international law. * Develop a mechanism to ensure victims receive court-ordered restitution payments. * Strengthen measures to ensure authorities consistently refer identified victims, including labor trafficking victims, to services and build the capacity of Child and Adolescent Court judges to provide trauma-informed procedures to child victims. * Provide reintegration and victim witness support, including immigration relief for undocumented migrant victims, to victims once they leave shelters to prevent re-trafficking. * Increase funding and capacity building for police, prosecutors, and judges throughout the country. * Expand prevention measures, including through raising awareness of fraudulent recruitment for employment in Guatemala and abroad; punishing employers or recruiters who commit fraudulent practices that facilitate trafficking; and enforcing a prohibition against worker-paid recruitment fees.

# PROSECUTION

The government maintained law enforcement efforts. The anti-trafficking law of 2009 criminalized sex trafficking and labor trafficking and prescribed penalties from eight to 18 years' imprisonment and a fine. These penalties were sufficiently stringent and, with respect to sex trafficking, commensurate with penalties prescribed for other serious crimes, such as rape. However, inconsistent with the definition of trafficking under international law, the law did not consider the use of force, fraud, or coercion as an essential element of an adult trafficking offense. The law defined trafficking broadly to include all labor exploitation a

illegal adoption without the purpose of exploitation.

The government did not provide complete data on its law enforcement efforts. Authorities opened investigations into 452 cases of suspected trafficking crimes (345 involving sex trafficking, 59 involving labor trafficking, and 48 involving unspecified forms of trafficking). This was an increase from 2022, when authorities investigated 356 suspects in 182 cases (150 involving sex trafficking, 21 involving labor trafficking, and 11 involving unspecified forms of trafficking). Authorities reported initiating prosecution of 200 suspects in 113 cases, including 36 involving sex trafficking, 17 involving labor trafficking, and 60 involving unspecified forms of trafficking. The government did not report the number of prosecutions ongoing from previous years. In comparison, authorities in 2022 reported initiating prosecutions of 162 defendants (135 accused of sex trafficking, 23 accused of labor trafficking, and four not specified) and continuing prosecutions of 143 defendants (85 for sex trafficking, 30 for labor trafficking, and 28 not specified) in cases ongoing from previous years. Some prosecutions may have been for crimes that did not meet the definition of trafficking according to international law. Courts convicted 44 traffickers, a decrease from 75 traffickers convicted in 2022. The government did not specify the types of trafficking crimes convicted traffickers committed or provide sentencing details for convicted traffickers. In the previous year, the government reported 20 convicted traffickers received prison sentences ranging from six to 20 years and fines up to 600,000 quetzals ($76,780) but did not report sentencing details for most convicted traffickers.

The National Civil Police maintained a specialized unit dedicated to investigating trafficking crimes, with a central office in Guatemala City and an office in Quetzaltenango, with jurisdiction to investigate trafficking crimes across six departments in western Guatemala. With support from an international donor, the government opened two new regional offices in Chiquimula and Huehuetenango. While these offices nominally increased investigation capabilities and expanded access to justice for victims in two departments with high trafficking risks, the government did not allocate sufficient funding. Local experts reported the specialized unit also had insufficient coverage relative to the scale of trafficking in Guatemala, and a lack of adequate training, technology, and equipment hindered effective investigations. Observers indicated National Civil Police officers across the country lacked an understanding of human trafficking. The government had a specialized anti-trafficking prosecution unit, with offices in Guatemala City, the western region, and the northeast region; specialized prosecutors in the capital handled trafficking cases from areas not covered by the region

offices. The government did not fulfill its plan to open an additional office in Petén in 2023. The government did not allocate sufficient resources to anti-trafficking police and prosecutions units; some key positions were vacant throughout the year, and the institutions relied on international donors to fund much of their work. The government operated three specialized first instance criminal courts in Guatemala City, Quetzaltenango, and Zacapa. In 2023, the government opened two new specialized courts in the departments of Petén and Huehuetenango. Together, operating courts had jurisdiction over the prosecution of trafficking and related crimes in 18 of Guatemala's 22 departments. However, the government expanded these courts' jurisdiction to include immigration offenses, thereby diminishing their capacity and specialization for trafficking crimes. A judge's approval was required for prosecutorial investigations, but the judicial system lacked adequate capacity to process cases in a timely manner. Insufficient Public Ministry (MP) resources and a lengthy appeals process caused further delays, with many legal processes lasting two to three years. Judicial officials did not always apply a victim-centered approach, and some lacked adequate training to apply forensic evidence in prosecutions. Some officials, especially those outside major urban areas, did not adequately recognize the elements and indicators of trafficking crimes and tried many cases as labor exploitation or sexual assault rather than trafficking, often leading to lesser sentences.

Corruption and official complicity in trafficking crimes remained a significant concern, inhibiting law enforcement action during the year; this problem was especially acute in border zones where government presence and rule of law were weak. Media reports based on interviews with migrants and asylum-seekers transiting Guatemala alleged police across the country routinely extorted migrants for money and some officials coerced migrants and asylum-seekers into sexual exploitation. These abuses exacerbated migrants and asylum-seekers' existing vulnerabilities to trafficking and further deterred vulnerable individuals from reporting crimes. Corrupt members of security forces facilitated trafficking crimes and perpetuated impunity by accepting bribes, working with criminal organizations, and/or inhibiting law enforcement. Corruption within some law enforcement institutions further hindered criminal justice efforts and undermined the rule of law.

In February 2023, authorities convicted the former head of the police's specialized anti-trafficking investigation unit who pleaded guilty to covering up evidence tied to his involvement with a sex trafficking ring. The court imposed a commutable sentence of th.

years and ten months' imprisonment. The court then reduced the sentence by half to one year and ten months' imprisonment, with an option to pay a fine of five quetzals per day of the sentence (approximately 3,325 quetzals or $425) in lieu of prison time. This penalty was inadequate compared to the seriousness of the offense and insufficient to deter other corrupt officials. A court acquitted one prison guard and initiated prosecutions against two others arrested in the previous reporting period for alleged involvement in a sex trafficking operation exploiting inmates in a women's prison. The government did not provide updates on a trial that began in November 2022 of a municipal mayor arrested for alleged involvement in the sex trafficking of a kidnapped 13-year-old-girl.

The government reported law enforcement authorities cooperated with unspecified foreign counterparts in one case and collaborated with authorities in the United States on an unspecified number of extradition processes related to trafficking cases. In 2023, police trained officers on the anti-trafficking law, and the judiciary held training programs on human trafficking for its employees through the judiciary's training school. Unlike last year, the MP did not provide training programs for its personnel. The government collaborated with international donors who funded and delivered additional training for officials on investigation techniques, victim identification, and victim-centered approaches.

# PROTECTION

The government maintained efforts to protect victims; however, it did not provide complete information on its victim identification and protection efforts. Authorities identified 611 victims in the last nine months of 2023, including 104 adults and 507 children. This was a significant increase from 318 victims identified by government authorities in 2022. NGOs identified an additional 348 victims in 2023, including at least four adults and 316 children. Unlike last year, the government did not disaggregate victim identification data by type of exploitation or victims' gender. Some victims counted in these statistics may have been victims of crimes that did not constitute trafficking under international law. The government did not provide complete data on foreign victims identified; however, the government and NGOs did ide
at least three U.S., two Colombian, five Honduran, one Mexican, and one Salvadoran vi

The government reported providing services to 225 victims in 2023, including 13 adults and 212 children. These victims included 198 women and girls and 27 men and boys; two were individuals with disabilities and eight were foreign nationals. However, the government did not provide detail about the services provided. In the first eight months of 2023, the government referred 188 victims to NGO and government shelters, an increase from 161 victims referred to shelters in 2022, where they received services including psycho-social support, medical care, legal assistance, and education and/or vocational training. Victims referred to shelters included 24 adults and 164 children; 156 were women and girls and 32 were men and boys. The Secretariat of Social Welfare (SBS) operated two specialized shelters for child trafficking victims and the Secretariat Against Sexual Violence, Exploitation, and Trafficking in Persons (SVET) operated one shelter for migrant women trafficking victims. The government did not report the number of victims it served in government-run shelters. In comparison, government shelters served 60 residents in 2022. NGOs operated other shelters, and authorities frequently referred victims to four NGO shelters that had specialized services for trafficking victims. The government provided 2.95 million quetzals ($377,480) to one NGO service provider, a decrease from 4.5 million quetzals ($575,820) provided to a different NGO in 2022. Government agencies and NGOs cooperated to provide services to victims such as food, housing, psychological care, healthcare, education, and job training. In 2023, the government allocated 2.71 million quetzals to the SBS shelters ($346,770), a modest increase from 2.3 million quetzals ($294,310) in 2022. The government did not report 2023 funding allocated to the SVET shelter, which received a budget of 2.39 million quetzals ($305,820) in 2022.

The government's Interinstitutional Commission Against Trafficking-in-Persons (CIT) finalized and government institutions began implementing an updated guide for authorities from various sectors to identify, refer, and provide services to trafficking victims. Immigration officials conducted interviews with migrants prior to deportation and the government screened returning unaccompanied migrant children for trafficking indicators using SBS protocols for the attention and reception of such children in two government shelters. However, authorities returned most unaccompanied children to their families without taking steps to decrease their vulnerability to exploitation. The government did not report whether it trained immigration officials on identifying trafficking victims in migration contexts or whether immigration officials referred any potential trafficking victims to prosecutors and service providers. Authorities did not screen government-affiliated Cuban nationals working in

Guatemala for trafficking indicators, despite concerns the Cuban government may have forced some of them to work.

The MP's Comprehensive Care Unit employed social workers who conducted individual needs assessments and referral to services for victims. Guatemalan law required judges in Child and Adolescent Courts to make all referrals for children to public or private shelters. However, delays in referrals from judges sometimes delayed victims' access to needed assistance. Judges placed some child victims with family members despite their involvement in the child's exploitation, leaving those children vulnerable to re-trafficking.

The government's child trafficking shelters in Guatemala City and Retalhuleu each had capacity to assist up to 30 residents at a time but frequently operated over capacity, and SVET's shelter for women migrant victims had the capacity to assist 30 victims at a time. The government provided only limited services for adult victims of trafficking and no shelters or services for adult men. Experts noted a shortage of shelters available to assist LGBTQI+ trafficking victims. With technical assistance from an NGO, the government continued implementing a care model to provide victim-centered, trauma-informed care through multidisciplinary teams in its two child trafficking shelters. The SBS trained officials on trafficking issues, including the implementation of a guide for providing care to LGBTQI+ adults; protection of child trafficking victims; and combating cyber-related trafficking crimes. With donor support, SVET trained government and NGO professionals who provide care to trafficking victims on victim-centered methods. The government provided few services to Indigenous victims and others in rural locations where government presence and multilingual capacity were limited. The government did not provide sufficient long-term care and reintegration support to victims and case follow up was inadequate, leaving victims vulnerable to further exploitation.

The government had policies and procedures to support victims during the criminal justice process. However, resources were insufficient to extend access to these measures to all victims. The government permitted some victims to give testimony via video, in a Gesell Chamber, or from behind a partition in the courtroom to protect the victim's identity and privacy. The five specialized courts offered psychological services for some victims and enhanced procedures to ensure confidentiality for victims and witnesses. The MP emp' social workers and psychologists to serve as liaisons between the office and victims,

accompany victims through the proceedings against traffickers, and assist victims in accessing medical services. Nonetheless, NGOs reported authorities sometimes used harsh questioning that re-traumatized victims during legal proceedings. The law required judges to order restitution when sentencing traffickers, but the government did not have a mechanism to ensure victims received court-ordered payments. The government did not report any victims received restitution in 2023 and has not done so since 2016. Guatemala's antitrafficking law provided legal alternatives to the removal of foreign victims who may face hardship or retribution upon return to their home countries. The government granted foreign victims temporary residence status. However, local stakeholders reported this was insufficient to allow foreign victims to participate in legal proceedings. Lengthy criminal justice processes, coupled with a lack of assistance to find legal employment, posed a disincentive to foreign adult victims to remain in the country for the duration of trials. These factors hindered effective prosecutions and limited foreign victims' access to comprehensive services in Guatemala. With support from an NGO, the government updated its interagency protocol for the repatriation of trafficking victims. The government coordinated the repatriation, funded by an international organization, of one foreign victim to their home country. Due to a lack of formal identification procedures to proactively identify victims among some vulnerable groups, such as children apprehended for gang-related criminal activity, authorities may have detained and arrested some unidentified trafficking victims.

# PREVENTION

The government maintained strong prevention efforts. As the secretariat for the CIT, comprised of government institutions, NGOs, and international organizations, SVET coordinated efforts against trafficking at the national level. SVET's 2023 budget totaled 3.61 million quetzals ($461,930). This was an increase from 2022, when the government allocated a budget of 2.83 million quetzals ($362,120) to SVET. Civil society organizations and foreign donors also provided funding to many of SVET's initiatives, and CIT member institutions funded anti-trafficking activities from their general budgets. The government enacted a new national anti-trafficking action plan for 2024-2028. CIT members convened working sessions to update the government's 2014-2024 public policy against trafficking, but these updates

not finalized.

SVET supported stakeholders in four departments that had local coordinating bodies comprised of government, NGO, and other stakeholders. Authorities in Huehuetenango launched a coordinating body bringing the total to five. SVET continued conducting extensive outreach programs, offering education on preventing trafficking to members of public and private institutions and public-awareness activities for members of the public. SVET continued to prioritize outreach to municipalities where reports of trafficking and history of training and outreach activities were both low, as well as municipalities with the highest youth populations according to the most recent census. With donor funding, SVET's mobile units traveled to rural areas to raise awareness among underserved communities. However, SVET officials lacked the authority to receive complaints or refer potential victims to services, undermining the impact of outreach efforts, particularly in remote areas with limited anti-trafficking infrastructure. SVET continued an awareness campaign to prevent trafficking among returning migrants and persons transiting Guatemala. SVET employed multilingual staff to support outreach activities in Mayan languages; it produced prevention and awareness materials in those languages as well as Spanish, Garifuna, Braille, and sign language to reach vulnerable populations. The government did not have a trafficking-specific hotline but operated several platforms for reporting crimes over the phone or online; authorities identified victims as a result of these calls but did not provide additional details.

The government continued to maintain a web portal to report child labor complaints. The government did not report whether it received any complaints involving forced child labor or if it referred any cases to law enforcement for criminal investigation. The Ministry of Labor and Social Welfare (MINTRAB) conducted targeted inspections assessing workplaces for indicators of forced labor, but it lacked sufficient human and financial resources to conduct effective labor inspections and identify forced labor cases. Unlike last year, the government did not identify any trafficking victims during labor inspections. A MINTRAB policy prohibited employers or recruiters from charging workers recruitment fees but did not prescribe penalties for violating the policy. The government implemented a new law requiring private recruiters to register and receive permission to operate, but oversight and enforcement was inadequate and underfunded. The MINTRAB conducted trainings on labor rights in the United States and mechanisms for assisting exploited workers abroad for members of its tech team that facilitated Guatemalan workers' participation in temporary work programs in

United States. MINTRAB led an inter-institutional campaign to provide prospective migrant workers with information about free labor mobility services and raise awareness of fraudulent recruitment. Authorities arrested twelve suspects on charges of fraud, money laundering, and illicit association for running a scam operation falsely promising to provide H-2 visas for work in the United States in exchange for payment.

The government continued implementing a media campaign to raise public awareness on preventing extraterritorial commercial child sexual exploitation and abuse. The government participated in a program with authorities in the United States to limit entry into Guatemala of sex offenders convicted in the United States. In 2023, authorities denied 25 sex offenders entry into Guatemala through this program.

# TRAFFICKING PROFILE:

As reported over the past five years, human traffickers exploit domestic and foreign victims in Guatemala, and traffickers exploit victims from Guatemala abroad. Traffickers exploit Guatemalan adults and children in sex trafficking within the country and in Mexico, the United States, Belize, and other countries. LGBTQI+ persons are at particular risk of sex trafficking. Foreign nationals, predominantly men from Canada, the United States, and Western Europe, as well as Guatemalan men, purchase commercial sex acts from child trafficking victims. Traffickers exploit women and children from other Latin American countries and the United States in sex trafficking in Guatemala. Traffickers exploit Guatemalan adults and children in forced labor within the country, often in agriculture or domestic service. Traffickers often target individuals internally migrating from rural areas to cities. The negative impacts of climate change on rural livelihoods are driving increased urbanization and exacerbating existing risk factors among members of underserved communities. Experts identified the coffee, broccoli, sugar, stone quarry, and fireworks manufacturing sectors as at risk for the potential use of forced child labor. Some women and girls in forced marriages are subjected to domestic servitude. Traffickers particularly target Indigenous Guatemalans, including children, for forced labor, Including in tortilla-making shops in Guatemala and foreign countries. Traffickers exploit Guatemalan children in forced labor in begging, street vending, and street performers, particularly within Guatemala City and along the border with Mexico. Child

victims' families are often complicit in their exploitation. Local experts report online sexual exploitation of children occurs, in which traffickers sexually exploit children in live internet broadcasts in exchange for compensation. Criminal organizations, including gangs, exploit girls in sex trafficking and coerce and threaten boys and young men in urban areas to sell or transport drugs, participate in extortion, or commit murder; local experts observed an increase in the recruitment of victims by organized criminal groups. Traffickers subject Guatemalan adults to forced labor in Mexico, the United States, and other countries, including in agriculture, the garment industry, and domestic service. Guatemalan children are vulnerable to forced labor in factories in the United States. Traffickers exploit some Latin American migrants and asylum-seekers transiting Guatemala en route to Mexico or the United States in sex trafficking or forced labor within the country or upon arrival at their destination. Traffickers frequently target the most vulnerable migrants and asylum-seekers, including members of marginalized populations that frequently experience discrimination from authorities, who are often fearful to report abuses. Migrants who rely on migrant smugglers are at particularly high risk of exploitation as they are moving outside regular migration channels and often assume debts to pay smugglers. Traffickers increasingly use online recruitment methods to reach victims, particularly children, continuing a trend that accelerated during the COVID-19 pandemic. Traffickers have exploited victims in migrant shelters. Authorities have investigated police, military, and elected officials for paying children for sex acts, facilitating child sex trafficking, accepting bribes from traffickers, or protecting venues where trafficking occurs. Government officials in the national banking system allegedly assisted traffickers in committing money laundering crimes. Government-affiliated Cuban workers in Guatemala, including medical professionals contracted by the Guatemalan government, may have been forced to work by the Cuban government.

**TAGS**

Bureau of Western Hemisphere Affairs     Guatemala     Human Trafficking

Office to Monitor and Combat Trafficking in Persons     Reports

White House

USA.gov

Office of the Inspector General

Archives

Contact Us

America 250

Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
830 PINEHILL ROAD
JENA, LA  71342

███████████████████

180 PINE BAYOU CIR
RICHWOOD, LA 71202

In the matter of            File A ████████        DATE: Jun 11, 2025
███████████████████

\_\_ Unable to forward - No address provided.

**\_X\_ Attached is a copy of the decision of the Immigration Judge. This decision
is final unless an appeal is filed with the Board of Immigration Appeals
within 30 calendar days of the date of the mailing of this written decision.
See the enclosed forms and instructions for properly preparing your appeal.
Your notice of appeal, attached documents, and fee or fee waiver request
must be mailed to:    Board of Immigration Appeals
                      Office of the Clerk
                      5107 Leesburg Pike, Suite 2000
                      Falls Church, VA 22041**

\_\_ Attached is a copy of the decision of the immigration judge as the result
of your Failure to Appear at your scheduled deportation or removal hearing.
This decision is final unless a Motion to Reopen is filed in accordance
with Section 242b(c)(3) of the Immigration and Nationality Act, 8 U.S.C. §
1252b(c)(3) in deportation proceedings or section 240(b)(5)(C), 8 U.S.C. §
1229a(b)(5)(C) in removal proceedings.  If you file a motion to reopen, your
motion must be filed with this court:
                      IMMIGRATION COURT
                      830 PINEHILL ROAD
                      JENA, LA  71342

\_\_ Attached is a copy of the decision of the immigration judge relating to a
Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. §
1208.31(g)(1), no administrative appeal is available. However, you may file
a petition for review within 30 days with the appropriate Circuit Court of
Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA §242.

\_\_ Attached is a copy of the decision of the immigration judge relating to a
Credible Fear Review. This is a final order. No appeal is available.

**\_X\_ Other: ADDENDUM OF LAW, APPEAL PACKET, AND DOSHR ATTACHED**

_____ VS _____

COURT CLERK
IMMIGRATION COURT                              FF

cc: CHIEF COUNSEL
    830 Pinehill Road
    Jena, LA,  71342



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**LASALLE IMMIGRATION COURT**

Respondent Name:

To: ███████████████████████

180 PINE BAYOU CIR
RICHWOOD, LA 71202

A-Number:
███████████████

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
06/10/2025

## ORDER OF THE IMMIGRATION JUDGE

☑ This is a summary of the oral decision entered on 06/10/2025. The oral decision in this case is the official opinion, and the immigration court issued this summary for the convenience of the parties.

☐ Both parties waived the issuance of a formal oral decision in this proceeding.

### I.    Removability

The immigration court found Respondent ☑ removable ☐ inadmissible under the following Section(s) of the Immigration and Nationality Act (INA or Act): 212(a)(6)(A)(i).

The immigration court found Respondent ☑ not removable ☐ not inadmissible under the following Section(s) of the Act: 212(a)(7)(A)(i)(I) - withdrawn by DHS on April 1, 2025.

### II.    Applications for Relief

Respondent's application for:

A. Asylum/Withholding/Convention Against Torture
   ☑ Asylum was ☐ granted ☑ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

   ☑ Withholding of Removal under INA § 241(b)(3) was ☑ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

   ☑ Withholding of Removal under the Convention Against Torture was ☐ granted ☐ denied ☐ withdrawn with prejudice ☑ withdrawn without prejudice

   ☐ Deferral of Removal under the Convention Against Torture was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

   ☐ Respondent knowingly filed a frivolous application for asylum after notice of the consequences. *See* INA § 208(d)(6); 8 C.F.R. §1208.20

B. Cancellation of Removal

☐ Cancellation of Removal for Lawful Permanent Residents under INA § 240A(a) was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Cancellation of Removal for Nonpermanent Residents under INA § 240A(b)(1) was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Special Rule Cancellation of Removal under INA § 240A(b)(2) was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

C.  Waiver

☐ A waiver under INA § was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

D.  Adjustment of Status

☐ Adjustment of Status under INA § was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

E.  Other

The Respondent's application for Withholding of Removal under the Convention Against Torture was denied as moot

### III.    Voluntary Departure

☐ Respondent's application for ☐ pre-conclusion voluntary departure under INA § 240B(a) ☐ post-conclusion voluntary departure under INA § 240B(b) was ☐ denied.

☐ Respondent's application for ☐ pre-conclusion voluntary departure under INA § 240B(a) ☐ post-conclusion voluntary departure under INA § 240B(b) was ☐ granted, and Respondent is ordered to depart by               . The respondent must post a $ bond with DHS within five business days of this order. Failure to post the bond as required or to depart by the required date will result in an alternate order of removal to taking effect immediately.

☐ The respondent is subject to the following conditions to ensure his or her timely departure from the United States:

☐  Further information regarding voluntary departure has been added to the record.

☐ Respondent was advised of the limitation on discretionary relief, the consequences for failure to depart as ordered, the bond posting requirements, and the consequences of filing a post-order motion to reopen or reconsider:

If Respondent fails to voluntarily depart within the time specified or any extensions granted by the DHS, Respondent shall be subject to a civil monetary penalty as provided by relevant statute, regulation, and policy. *See* INA § 240B(d)(1). The immigration court has set ☐ the presumptive civil monetary penalty amount of $3,000.00 USD ☐ $ USD instead of the presumptive amount.

If Respondent fails to voluntarily depart within the time specified, the alternate order of removal shall automatically take effect, and Respondent shall be ineligible, for a period of 10 years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Act, to include cancellation of removal, adjustment of status, registry, or change of

nonimmigrant status. *Id.* If Respondent files a motion to reopen or reconsider prior to the expiration of the voluntary departure period set forth above, the grant of voluntary departure is automatically terminated; the period allowed for voluntary departure is not stayed, tolled, or extended. If the grant of voluntary departure is automatically terminated upon the filing of such a motion, the penalties for failure to depart under section 240B(d) of the Act shall not apply.

If Respondent appeals this decision, Respondent must provide to the Board of Immigration Appeals (Board), within 30 days of filing an appeal, sufficient proof of having posted the voluntary departure bond. The Board will not reinstate the voluntary departure period in its final order if Respondent does not submit timely proof to the Board that the voluntary departure bond has been posted.

In the case of conversion to a removal order where the alternate order of removal immediately takes effect, where Respondent willfully fails or refuses to depart from the United States pursuant to the order of removal, to make timely application in good faith for travel or other documents necessary to depart the United States, to present himself or herself at the time and place required for removal by the DHS, or conspires to or takes any action designed to prevent or hamper Respondent's departure pursuant to the order of removal, Respondent may be subject to a civil monetary penalty for each day Respondent is in violation. If Respondent is removable pursuant to INA § 237(a), then he or she shall be further fined or imprisoned for up to 10 years.

## IV.     Removal

☑    Respondent was ordered removed to DEMOCRATIC REPUBLIC OF CONGO.

☐    In the alternative, Respondent was ordered removed to

☐    Respondent was advised of the penalties for failure to depart pursuant to the removal order:

> If Respondent is subject to a final order of removal and willfully fails or refuses to depart from the United States pursuant to the order, to make timely application in good faith for travel or other documents necessary to depart the United States, to present himself or herself at the time and place required for removal by the DHS, or conspires to or takes any action designed to prevent or hamper Respondent's departure pursuant to the order of removal, Respondent may be subject to a civil monetary penalty for each day Respondent is in violation. If Respondent is removable pursuant to INA § 237(a), then he or she shall be further fined or imprisoned for up to 10 years.

## V.     Other

☐ Proceedings were ☐ dismissed ☐ terminated with prejudice ☐ terminated without prejudice ☐ administratively closed.

☐ Respondent's status was rescinded under INA § 246.

☑ Other:

> The docketed hearing location is at the Jena Immigration Court in Louisiana. The Immigration Judge is physically located in Richmond, VA. As the Richmond Immigration Adjudication Center is located in the jurisdiction of the United States Court of Appeals for the Fourth Circuit, the Court applies Fourth Circuit precedent to these proceedings. Herrera-Alcala v. Garland, 39 F.4th 233, 242 (4th Cir. 2022).

An addendum, stating the standards of law and burdens of proof relevant to these issues will be placed in the record of proceedings. That addendum is hereby adopted and incorporated into this decision by reference.

Immigration Judge: Palmer, Brian 06/10/2025

Appeal:     Department of Homeland Security:  ☑ waived    ☐ reserved
            Respondent:                       ☐ waived    ☑ reserved
Appeal Due: 07/10/2025

### Certificate of Service

This document was served:
Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable
To: [ ] Noncitizen | [ M ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS
Respondent Name : ███████████████████  A-Number : ██████████
Riders:
Date: 06/11/2025 By: Victoria Sparks, Court Staff

EXHIBIT E


**Sanctuary for Families**

CBWLS
30 Wall Street, 8th Fl.
New York, NY 10005
Tel: 212.349.6009
Fax: 212.566.0344
sanctuaryforfamilies.org

October 6, 2025
**VIA UPS OVERNIGHT**

U.S. Department of Homeland Security
Immigrations and Customs Enforcement
Attn: T. Van Zandt, Deportation Officer
1010 East Whatley Road
Oakdale, Louisiana 71463

To Officer T. Van Zandt:

    This letter is submitted in response to the Notice to Alien of File Custody Review for ███████████ (A# 2█████, DOB: █████).

<u>**MS. ███████████████████ SHOULD BE RELEASED BECAUSE:**</u>
1. <u>**SHE HAS NO CRIMINAL HISTORY,**</u>
2. <u>**SHE HAS BEEN A MODEL DETAINEE,**</u>
3. <u>**SHE IS READY AND WILLING TO WORK, AND**</u>
4. <u>**HAS A COMMUNITY THAT IS READY TO RECEIVE HER.**</u>

    ███████████ is a ██ year-old native of the Democratic Republic of the Congo and was granted withholding of removal by an immigration judge on June 10, 2025. She has been continuously detained in the custody of ICE since she was apprehended at the U.S.-Mexico border around January, 2025- a period of over nine months. She is currently incarcerated at the Richwood Correctional Center, an immigrant detention center in Monroe, Louisiana. Ms. ████ is an excellent candidate for release. She has no criminal history and no disciplinary issues while in ICE detention. Ms. ████ has been a model detainee, praying with her fellow Christian detainees and volunteering in both the kitchen and laundry room of Richwood Correctional Center. Ms. █████ is ready and willing to work. Together with Ms. ██████, we have filed an I-765 Application for Employment Authorization based on her grant of withholding. Finally, Ms. ████ has community in Norman, Oklahoma ready to receive her. We respectfully request that the ICE deciding official find in support of Ms. ██████ release.

<u>**STANDARD FOR REVIEW**</u>
    When an IJ grants a noncitizen withholding or CAT relief, the IJ issues a removal order and simultaneously withholds or defers that order with respect to the country or countries for which the noncitizen demonstrated a sufficient risk of persecution or torture. *See Johnson v. Guzman Chavez,* 594 U.S. 523, 531–32 (2021). Once withholding or CAT relief is granted, either party has the right to appeal that

**Hon. Judy Harris Kluger**
*Chief Executive Officer*

**BOARD OF DIRECTORS**

**Michèle O. Penzer**
*President*

**Jamila Abston Mayfield**
**Sunita Jaffrey**
**Anita Kawatra**
**Sunita Koshy**
*Vice Presidents*

**Abby F. Kohnstamm**
*Secretary*

**Francesca Odell**
*Treasurer*

**Nefertiti J. Alexander**
**Anne-Victoire Auriault**
**Gregory Baker**
**Flore E. Baptiste**
**Garrard R. Beeney**
**Kara M. Bellew**
**Ingrid Bilowich-von Ahn**
**Jeannette Boot**
**Diana Brummer**
**Iris Chiu**
**Michele Dinn**
**Claudia Hammerman**
**Nyesha Hightower**
**Ida Hoghooghi**
**Tracy Jaffe**
**Ted Lazarus**
**Maria Meneses**
**Ana L. Oliveira**
**Anastasia Danias Schmidt**
**Barbara Seril**
**Steven Slutzky**
**Molly G. Snyder**
**Ladan F. Stewart**
**Alita T. Wingfield**

**PAST PRESIDENTS**

**Sarah Burke***
**Catherine Douglass**
**Stephanie Ferdman**
**William F. Gorin**
**Theresa Ann Havell***
**John R. Horan**
**Mary Ann Mailman**
**Loretta McCarthy**
**Denis J. McInerney**
**Catherine Woodman**

*in memoriam*



CBWLS
30 Wall Street, 8th Fl.
New York, NY 10005
Tel: 212.349.6009
Fax: 212.566.0344
sanctuaryforfamilies.org

**Hon. Judy Harris Kluger**
*Chief Executive Officer*

**BOARD OF DIRECTORS**

**Michèle O. Penzer**
*President*

**Jamila Abston Mayfield**
**Sunita Jaffrey**
**Anita Kawatra**
**Sunita Koshy**
*Vice Presidents*

**Abby F. Kohnstamm**
*Secretary*

**Francesca Odell**
*Treasurer*

**Nefertiti J. Alexander**
**Anne-Victoire Auriault**
**Gregory Baker**
**Flore E. Baptiste**
**Garrard R. Beeney**
**Kara M. Bellew**
**Ingrid Bilowich-von Ahn**
**Jeannette Boot**
**Diana Brummer**
**Iris Chiu**
**Michele Dinn**
**Claudia Hammerman**
**Nyesha Hightower**
**Ida Hoghooghi**
**Tracy Jaffe**
**Ted Lazarus**
**Maria Meneses**
**Ana L. Oliveira**
**Anastasia Danias Schmidt**
**Barbara Seril**
**Steven Slutzky**
**Molly G. Snyder**
**Ladan F. Stewart**
**Alita T. Wingfield**

**PAST PRESIDENTS**

**Sarah Burke***
**Catherine Douglass**
**Stephanie Ferdman**
**William F. Gorin**
**Theresa Ann Havell***
**John R. Horan**
**Mary Ann Mailman**
**Loretta McCarthy**
**Denis J. McInerney**
**Catherine Woodman**

*\*in memoriam*

8 U.S.C. § 1231 governs the detention of noncitizens "during" and "beyond" the "removal period." 8 U.S.C. §§ 1231(a)(2)-(6). The "removal period" begins once a noncitizen's removal order "becomes administratively final." 8 U.S.C. § 1231(a)(1)(B). The removal period lasts for 90 days, during which ICE "shall remove the [noncitizen] from the United States" and "shall detain the [noncitizen]" as it carries out the removal. 8 U.S.C. §§ 1231(a)(1)-(2). If ICE does not remove the noncitizen within the 90-day removal period, the noncitizen "may be detained beyond the removal period" if they meet certain criteria, such as being inadmissible or deportable under specified statutory categories. 8 U.S.C. § 1231(a)(6).

DHS regulations provide that, by the end of the 90-day removal period that ensues upon a noncitizen's removal order becoming final, the local ICE field office with jurisdiction over the noncitizen's detention must conduct a custody review to determine whether the noncitizen should remain detained. See 8 C.F.R. §§ 241.4(c)(1), (k)(1)(i) ("Prior to the expiration of the removal period, the district director . . . shall conduct a custody review . . .").

Before making any recommendation or decision to release a detainee, a majority of the Review Panel members, or the Director of the HQPDU in the case of a record review, must conclude that:
    (1) Travel documents for the alien are not available or, in the opinion of the Service, immediate removal, while proper, is otherwise not practicable or not in the public interest;
    (2) The detainee is presently a non-violent person;
    (3) The detainee is likely to remain nonviolent if released;
    (4) The detainee is not likely to pose a threat to the community following release;
    (5) The detainee is not likely to violate the conditions of release; and
    (6) The detainee does not pose a significant flight risk if released.

In making this determination, the statute enumerates factors that should be weighed in considering whether to recommend the release of a detainee. These factors include but are not limited to ties to the United States such as close relatives residing here lawfully, and information that is probative of whether the person is likely to adjust to life in a community. 8 CFR §241.4(f)(1-8). The Notice to Alien of File Custody Review similarly outlines factors that the Deciding Official may consider, but is not limited to considering:

    (1)   The nature and seriousness of your criminal convictions
    (2)   Other criminal history;
    (3)   Sentence(s) imposed and time actually served;
    (4)   History of escapes, failures to appear for judicial or other proceedings, and other defaults;
    (5)   Probation history;
    (6)   Disciplinary problems while incarcerated;
    (7)   Evidence of rehabilitative effort or recidivism;


**Sanctuary for Families**

CBWLS
30 Wall Street, 8th Fl.
New York, NY 10005
Tel: 212.349.6009
Fax: 212.566.0344
sanctuaryforfamilies.org

(8)  Equities in the United States;
(9)  Prior immigration violations and history; and
(10)  Cooperation in obtaining your travel document

In *Zadvydas v. Davis*, the court recognized that the Constitution demands limits on a person's post-removal-period detention to a period reasonably necessary to bring about that person's removal from the United States.  533 U.S. 678, 689(2001). The statute describes review procedures for individuals detained beyond the removal period who have "provided good reason to believe there is no significant likelihood of removal to the country to which they were ordered removed, or to a third country, in the reasonably foreseeable future." 8 CFR §241.4(i)(7). If DHS concludes that there is no significant likelihood of the individual's removal in the reasonably foreseeable future, then the individual should be promptly released on conditions, unless there are "special circumstances justifying continued detention." 8 CFR §241.13.  Under this procedure, ICE HQ evaluates the foreseeability of removal by analyzing factors such as the history of ICE's removal efforts to third countries. *See id.* § 241.13(f). If ICE HQ determines that removal is not reasonably foreseeable but nonetheless seeks to continue detention based on "special circumstances," it must justify the detention based on narrow grounds such as national security or public health concerns, *id.* §§ 241.14(b)-(d), or by demonstrating by clear and convincing evidence before an IJ that the noncitizen is "specially dangerous." *Id.* §241.14(f).

██████████████████ **IS AN EXCELLENT CANDIDATE FOR
RELEASE**

    Here, ██████████████████ is a ██-year-old native of the Democratic Republic of the Congo and was granted withholding of removal by an immigration judge on June 10, 2025. She has been continuously detained in the custody of ICE since she was apprehended at the U.S.-Mexico border around January, 2025- a period of over nine months. She is currently incarcerated at the Richwood Correctional Center, an immigrant detention center in Monroe, Louisiana.

    A consideration of the factors for custody review will show that release is favorable for Ms. ████████. Ms. ████████ has no criminal convictions or other criminal history. She has no history of escapes or failures to appear for proceedings. She has no probation history. She has had no disciplinary problems while held in ICE detention.

    In fact, while in detention. Ms. ████████ has volunteered in the kitchen and in the laundry room. She has made connections with other detainees and has led Christian prayer service and sermons with her fellow detainees. Ms. ████████ has spent her time doing fellow detainees' hair, much like she did in her experience as a hairdresser in the Democratic Republic of Congo.

    Ms. ████████ has been a model detainee during her time in Richwood Detention Center. She has been a non-violent person in the nine months she has been

**Hon. Judy Harris Kluger**
*Chief Executive Officer*

**BOARD OF DIRECTORS**

**Michèle O. Penzer**
*President*

**Jamila Abston Mayfield**
**Sunita Jaffrey**
**Anita Kawatra**
**Sunita Koshy**
*Vice Presidents*

**Abby F. Kohnstamm**
*Secretary*

**Francesca Odell**
*Treasurer*

**Nefertiti J. Alexander**
**Anne-Victoire Auriault**
**Gregory Baker**
**Flore E. Baptiste**
**Garrard R. Beeney**
**Kara M. Bellew**
**Ingrid Bilowich-von Ahn**
**Jeannette Boot**
**Diana Brummer**
**Iris Chiu**
**Michele Dinn**
**Claudia Hammerman**
**Nyesha Hightower**
**Ida Hoghooghi**
**Tracy Jaffe**
**Ted Lazarus**
**Maria Meneses**
**Ana L. Oliveira**
**Anastasia Danias Schmidt**
**Barbara Seril**
**Steven Slutzky**
**Molly G. Snyder**
**Ladan F. Stewart**
**Alita T. Wingfield**

**PAST PRESIDENTS**

**Sarah Burke***
**Catherine Douglass**
**Stephanie Ferdman**
**William F. Gorin**
**Theresa Ann Havell***
**John R. Horan**
**Mary Ann Mailman**
**Loretta McCarthy**
**Denis J. McInerney**
**Catherine Woodman**

*in memoriam*



CBWLS
30 Wall Street, 8th Fl.
New York, NY 10005
Tel: 212.349.6009
Fax: 212.566.0344
**sanctuaryforfamilies.org**

there and is likely to remain nonviolent if released to her cousin, ███████ in ████████ Ms. █████is not likely to pose a threat to the community following release and looks forward to joining a Christian Church in ████████ She is not likely to violate the conditions of release, and does not pose a significant flight risk if released because she believes that the United States is the safest place for her, away from her abuser.

Ms. ███████has cousins and other family members and community members in the United States that are ready to welcome her and house her. Ms. ████████is ready to join her cousin in ████████, ████ Our office filed an I-765 according to her grant of withholding in advance of Ms. ████████s release so that she can be work authorized and self-sufficient. Ms. ████████ is interested in working in restaurants or as a hairdresser, and is interested in going to school for medicine.

She has no prior immigration violations. Ms. ████████has not been asked to collaborate with ICE or detention officers towards obtaining a travel document, and thus has not failed in making an application for one. However, even if Ms. ████████ failed to obtain a travel document, the failure was not willful or a refusal. Ms. ████████s abuser is a government official who would be notified if Ms. ████████ was able to obtain a government document such as a passport. His reach is evident in his ability to contact Ms. ████████after she fled the Democratic Republic of Congo. Therefore, efforts to obtain these documents would not be practicable and not in the public interest.

Ms. ████████speaks English and French. She is educated. She will be a productive, positive community member and neighbor. It is in the national and public interest to release such a promising young woman.

## PROCEDURAL HISTORY

On June 10, 2025, the Immigration Judge granted Ms. ████████withholding of removal under 8 U.S.C. § 1231(b)(3), INA § 241(b)(3) to the Democratic Republic of the Congo. ==See attached, IJ Order.==

On June 27, 2025, our office submitted a G-28 and an advocacy letter to New Orleans Outreach Office informing ICE that our office represents Ms. ████████ and responding to ICE officers suggestion of removing Ms. ████████to Spain or Canada. Our office received no response.

On July 10, 2025, we submitted the same documents and a sworn statement by Ms. ████████ We also requested necessary medical attention for Ms. ████████ Ms. ████████provided us with two emails that she was informed were emails of her case officers.

On July 27 2025, New Orleans Outreach Team responded to our correspondence, informing us that they contacted Ms. ████████s case officers. They

**Hon. Judy Harris Kluger**
*Chief Executive Officer*

**BOARD OF DIRECTORS**

**Michèle O. Penzer**
*President*

**Jamila Abston Mayfield**
**Sunita Jaffrey**
**Anita Kawatra**
**Sunita Koshy**
*Vice Presidents*

**Abby F. Kohnstamm**
*Secretary*

**Francesca Odell**
*Treasurer*

**Nefertiti J. Alexander**
**Anne-Victoire Auriault**
**Gregory Baker**
**Flore E. Baptiste**
**Garrard R. Beeney**
**Kara M. Bellew**
**Ingrid Bilowich-von Ahn**
**Jeannette Boot**
**Diana Brummer**
**Iris Chiu**
**Michele Dinn**
**Claudia Hammerman**
**Nyesha Hightower**
**Ida Hoghooghi**
**Tracy Jaffe**
**Ted Lazarus**
**Maria Meneses**
**Ana L. Oliveira**
**Anastasia Danias Schmidt**
**Barbara Seril**
**Steven Slutzky**
**Molly G. Snyder**
**Ladan F. Stewart**
**Alita T. Wingfield**

**PAST PRESIDENTS**

**Sarah Burke***
**Catherine Douglass**
**Stephanie Ferdman**
**William F. Gorin**
**Theresa Ann Havell***
**John R. Horan**
**Mary Ann Mailman**
**Loretta McCarthy**
**Denis J. McInerney**
**Catherine Woodman**

*\*in memoriam*



CBWLS
30 Wall Street, 8th Fl.
New York, NY 10005
Tel: 212.349.6009
Fax: 212.566.0344
sanctuaryforfamilies.org

provided the contact information of two case officers that did not match the case officers that Ms. ███████ was told were assigned to her. New Orleans Outreach also informed us that these case officers were contacting Guatemalan representatives to Request Acceptance of Alien. They also requested that Ms. ███████ be medically evaluated in the detention facility.

On August 26, 2025 we responded with another letter explaining Ms. ███████'s fear of removal to Guatemala due to her previous experience being located by her persecutor as she was fleeing through Central America to the United States. Our office received no response.

As of this date of filing, ICE has not  removed Ms. ███████ to any alternate or third country. Upon information and belief, attempts to remove her to Canada, Spain, and Guatemala have failed.

Based on Ms. ███████'s grant of withholding, her removal order became administratively final when her opportunity to appeal expired. Thus, removal order issued on June 10, 2025 became final after Ms. ███████'s opportunity to appeal expired on July 10, 2025. Ms. ███████ did not file an appeal to the IJ's decision. Thus, the 90-day removal period ends on October 10, 2025, with Ms. ███████'s custody status set to be reviewed on October 9, 2025. Ms. ███████ may only be held beyond October 10, 2025 if she is inadmissible, or determined by the Attorney General to be a risk to the community, or unlikely to comply with the order of removal.

Ms. ███████ is currently inadmissible because she does not have a passport. Ms. ███████ was unable to apply for and obtain a passport in the short, urgent period of time when she was fleeing from her abuser. Because her abuser works in government, is well connected, and widely feared in the community, Ms. ███████ was unable to obtain a passport.

We respectfully request that Ms. ███████ be released despite these inadmissibilities because Ms. ███████'s experience as a survivor of battery and cruelty due to forced marriage. We respectfully request that the ICE deciding official exercise their discretion to release Ms. ███████ from ICE detention.

Hon. Judy Harris Kluger
*Chief Executive Officer*

**BOARD OF DIRECTORS**

Michèle O. Penzer
*President*

Jamila Abston Mayfield
Sunita Jaffrey
Anita Kawatra
Sunita Koshy
*Vice Presidents*

Abby F. Kohnstamm
*Secretary*

Francesca Odell
*Treasurer*

Nefertiti J. Alexander
Anne-Victoire Auriault
Gregory Baker
Flore E. Baptiste
Garrard R. Beeney
Kara M. Bellew
Ingrid Bilowich-von Ahn
Jeannette Boot
Diana Brummer
Iris Chiu
Michele Dinn
Claudia Hammerman
Nyesha Hightower
Ida Hoghooghi
Tracy Jaffe
Ted Lazarus
Maria Meneses
Ana L. Oliveira
Anastasia Danias Schmidt
Barbara Seril
Steven Slutzky
Molly G. Snyder
Ladan F. Stewart
Alita T. Wingfield

**PAST PRESIDENTS**

Sarah Burke*
Catherine Douglass
Stephanie Ferdman
William F. Gorin
Theresa Ann Havell*
John R. Horan
Mary Ann Mailman
Loretta McCarthy
Denis J. McInerney
Catherine Woodman

*in memoriam*


**Sanctuary for Families**

CBWLS
30 Wall Street, 8th Fl.
New York, NY 10005
Tel: 212.349.6009
Fax: 212.566.0344
sanctuaryforfamilies.org

We respectfully request that the ICE deciding official find in support of Ms. ▮▮▮▮▮'s release.

Sincerely,

Emlyn Medalla, Esq.
Sanctuary for Families
30 Wall St, 8th Floor
New York, NY 10005

**Hon. Judy Harris Kluger**
*Chief Executive Officer*

**BOARD OF DIRECTORS**

**Michèle O. Penzer**
*President*

**Jamila Abston Mayfield**
**Sunita Jaffrey**
**Anita Kawatra**
**Sunita Koshy**
*Vice Presidents*

**Abby F. Kohnstamm**
*Secretary*

**Francesca Odell**
*Treasurer*

**Nefertiti J. Alexander**
**Anne-Victoire Auriault**
**Gregory Baker**
**Flore E. Baptiste**
**Garrard R. Beeney**
**Kara M. Bellew**
**Ingrid Bilowich-von Ahn**
**Jeannette Boot**
**Diana Brummer**
**Iris Chiu**
**Michele Dinn**
**Claudia Hammerman**
**Nyesha Hightower**
**Ida Hoghooghi**
**Tracy Jaffe**
**Ted Lazarus**
**Maria Meneses**
**Ana L. Oliveira**
**Anastasia Danias Schmidt**
**Barbara Seril**
**Steven Slutzky**
**Molly G. Snyder**
**Ladan F. Stewart**
**Alita T. Wingfield**

**PAST PRESIDENTS**

**Sarah Burke***
**Catherine Douglass**
**Stephanie Ferdman**
**William F. Gorin**
**Theresa Ann Havell***
**John R. Horan**
**Mary Ann Mailman**
**Loretta McCarthy**
**Denis J. McInerney**
**Catherine Woodman**

*in memoriam*



Office of Enforcement and Removal Operations

U.S. Department of Homeland Security
1010 East Whatley Road
Oakdale, LA 71463

U.S. Immigration
and Customs
Enforcement

Richwood Correctional Center
180 Pine Bayou Circle
Richwood, LA 71202

# Notice to Alien of File Custody Review

It is the policy of Immigration and Customs Enforcement (ICE) to periodically review the custody status of detained aliens who have final orders of removal, deportation or exclusion. You are required to cooperate with the ICE in effecting your removal from the United States.

The ICE Deciding Official will review your case for consideration of release on an Order of Supervision. Release from ICE custody is dependent on your demonstrating by "clear and convincing evidence" that you will not pose a danger to the community and will not be a significant flight risk.

Your custody status will be reviewed on or about _____ .10/09/2025_____ .The Deciding Official may consider, but is not limited to considering the following:

1. The nature and seriousness of your criminal convictions;
2. Other criminal history;
3. Sentence(s) imposed and time actually served;
4. History of escapes, failures to appear for judicial or other proceedings, and other defaults;
5. Probation history;
6. Disciplinary problems while incarcerated;
7. Evidence of rehabilitative effort or recidivism;
8. Equities in the United States;
9. Prior immigration violations and history; and
10. Cooperation in obtaining your travel document.

You may submit any documentation you wish to be reviewed in support of your release, prior to the date listed above, to the attention of the Officer and address below. English translations must be provided pursuant to 8 CFR 103.2(b)(3). An Attorney or other person may submit materials on your behalf.

U.S. Department of Homeland Security
Immigration and Customs Enforcement
Attn: T. Van Zandt                    Deportation Officer
1010 East Whatley Road
Oakdale, Louisiana 71463

A# ███████████      ███████████████████

## PROOF OF SERVICE

(1)    **Personal Service (Officer to complete both (a) and (b) below.)**

     (a)    I _____ DO Tippit _____, _____ Deportation Officer _____
                     Name of ICE Officer                        Title

certify that I served _____████████████_____ with a copy of
                                Name of detainee

this document at _Richwood Correctional Center_ on ___8·29·25___, at ___830___.
                     Institution                   Date          Time

     (b)    I certify that I served the custodian _____,
                                              Name of Official

_____, at _____, on
          Title                       Institution

_____ with a copy of this document.
         Date

OR

(2)    **Service by certified mail, return receipt.  (Attach copy of receipt)**

     I _____, _____, certify
                   Name of ICE Officer                 Title

that I served _____ and the custodian _____
Name of detainee      Nam            e of Official

with a copy of this document by certified mail at _____ on _____.
                          In        stitution        Date

( )  cc:  Attorney of Record or Designated Representative
( )  cc:  A-File

**U.S. Department of Justice**
Immigration and Naturalization Service

**Warning for Failure to Depart**

| Name: ████████████████ | District Office: New Orleans, | File #: A ████████ |
|---|---|---|

Section 243(a) of the Immigration and Nationality Act provides, in part, that:

Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 237(a) who -

(A)   willfully fails or refuses to depart from the United States within a period of 90 days * from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

(B)   willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

(C)   connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

(D)   willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under title 18, United States Code, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), (4) of section 237(a)), or both.

Nothing in this section shall make it a violation to take proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.

Any Action the Immigration and Naturalization Service may take to obtain a travel document for your departure or to remove you will *NOT* relieve you of the liability for compliance with the provisions of law referred to in the first paragraph above.

*    Section 241(a)(1)(C) provides for the extension of the statutory removal period of time if the alien refuses, during the removal period, to make application in good faith, for a travel or other document necessary for the alien's removal or departure or conspires or acts to prevent the alien's removal subject to an order of removal.

| Date Order Final: 07/11/2025 | Ordered Removed under Section: 212a7AiI |
|---|---|

| **Record of Service** (Check method used) |
|---|

| (    )    **Record of Personal Service** | |
|---|---|
| Served By: (Print Name and Title of Officer) DO T.pp.+ | Date: 8·29·25 |
| Officer's Signature: | Location of Service: Richwood Correctional Center |
| Served On: (Alien's Signature) X Refused to sign | Date: 8·29·25 |

| (    )    **Warning administered in Court** (Copy of order attached) | **Record of Personal Service (Cont)** |
|---|---|
| (    )    **Certified Mail Service** | Fingerprint of Alien (Specify finger used) |
| **Attach certified mail receipts here** | Refused to print |

Form I-229(a)
(Revised 12/04/02)

# INSTRUCTION SHEET TO DETAINEE REGARDING REQUIREMENT TO ASSIST IN REMOVAL

The following is a list of things you are required to complete within 30 days of receiving this form, in order comply with your obligation to assist in obtaining a travel document:

*Mandatory requirements will be checked off by the INS officer depending on the facts of each case. Failure to comply or provide sufficient evidence of your inability to comply, may result in the extension of the removal period and subject you to further detention. In addition, you may be subject to criminal prosecution. If you need assistance in complying with any of the requirements, please contact a Deportation Officer.*

- [x] Submit passports (current and expired) to the INS. If you have a copy of your passport, you are to submit it.
- [x] Apply for a travel document/passport from your embassy or consulate, or directly from your government in your native country, or any other embassy or consulate of your native country in another country.
- [x] Comply with all instructions from all embassies or consulates requiring completion of documentation for issuance of a travel document.
- [x] Submit to the INS birth certificates, national identification cards, and any other document issued by a foreign government indicating your citizenship, nationality, place of birth, and place of residence prior to entering the United States.
- [x] Provide names and addresses of family and friends residing in the United States and request that they contact your embassy or consulate in the United States, in order to facilitate the issuance of a travel document.
- [x] Provide names and addresses of family and friends residing in your country of citizenship and request family and friends residing abroad contact your government in reference to issuing a travel document.
- [x] You are required to take measures to request reinstatement of your previous nationality, register as required, or take any other action that will ensure the issuance of a travel document and your removal from the United States.
- [x] Provide INS with written copies of requests to embassies or consulates requesting issuance of a travel document.
- [x] Provide INS with written copies of responses from embassies or consulates regarding your requests.
- [x] Solicit permission from another country, which may be able to accept you, to enter that country to effect your removal from the United States.
- [ ] Other: _____

Alien's Signature  *Refused to sign*     A Number  ▮▮▮▮▮▮▮

Served by _____ on  8-29-25  at  Richwood Correctional Center
Officer's Name                      Date              Location

(Rev. 10/24/02)

A 249 140 639

Does the detainee have a place to live in the United States?          ☒ Yes          ☐ No

Describe: ███████████████

Is the Detainee subject to any parole or probation requirements?          ☐ Yes          ☒ No

Describe: N|A

Does the detainee have close family ties within the United States?          ☒ Yes          ☐ No

Describe: ██████████

Does the detainee have community ties or non-government sponsors?          ☐ Yes          ☒ No

Describe: None

Does the detainee have any employment prospects?          ☐ Yes          ☒ No

Describe: None

What is the detainee's employment history?

Describe: ████████████████████

What is the detainee's educational level?

Describe: █████████████

Does the detainee have any vocational training?          ☐ Yes          ☒ No

Describe: N|A

Has the detainee submitted any evidence of rehabilitation, courses while in prison, etc?

Describe: Works in the kitchen

<u>Medical/Psychological Concerns</u>

Does the detainee have any medical or psychological issues:          ☐ Yes          ☒ No

Description (to include Date and Source)

[blank box]

(Rev. 1/19/05)                    Page 5

*[handwritten, partially obscured by highlight: "GRANT to withholding ... wi..."]*

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
830 PINEHILL ROAD
JENA, LA  71342

████████████████████████
180 PINE BAYOU CIR
RICHWOOD, LA 71202

In the matter of          File A ██████████        DATE: Jun 11, 2025
████████████████████

___ Unable to forward - No address provided.
_X_ Attached is a copy of the decision of the Immigration Judge. This decision
    is final unless an appeal is filed with the Board of Immigration Appeals
    within 30 calendar days of the date of the mailing of this written decision.
    See the enclosed forms and instructions for properly preparing your appeal.
    Your notice of appeal, attached documents, and fee or fee waiver request
    must be mailed to:    Board of Immigration Appeals
                          Office of the Clerk
                          5107 Leesburg Pike, Suite 2000
                          Falls Church, VA 22041
___ Attached is a copy of the decision of the immigration judge as the result
    of your Failure to Appear at your scheduled deportation or removal hearing.
    This decision is final unless a Motion to Reopen is filed in accordance
    with Section 242b(c)(3) of the Immigration and Nationality Act, 8 U.S.C. §
    1252b(c)(3) in deportation proceedings or section 240(b)(5)(C), 8 U.S.C. §
    1229a(b)(5)(C) in removal proceedings.  If you file a motion to reopen, your
    motion must be filed with this court:
                          IMMIGRATION COURT
                          830 PINEHILL ROAD
                          JENA, LA  71342
___ Attached is a copy of the decision of the immigration judge relating to a
    Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. §
    1208.31(g)(1), no administrative appeal is available. However, you may file
    a petition for review within 30 days with the appropriate Circuit Court of
    Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA §242.
___ Attached is a copy of the decision of the immigration judge relating to a
    Credible Fear Review. This is a final order. No appeal is available.
_X_ Other: ADDENDUM OF LAW, APPEAL PACKET, AND DOSHR ATTACHED

                              _____VS_____
                              COURT CLERK
                              IMMIGRATION COURT                    FF

       cc: CHIEF COUNSEL
           830 Pinehill Road
           Jena, LA,  71342



**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**LASALLE IMMIGRATION COURT**

Respondent Name:

████████████████████████

To:

████████████████████████

180 PINE BAYOU CIR
RICHWOOD, LA 71202

A-Number:

████████████████

Riders:
In Removal Proceedings
Initiated by the Department of Homeland Security
Date:
06/10/2025

## ORDER OF THE IMMIGRATION JUDGE

☑ This is a summary of the oral decision entered on 06/10/2025. The oral decision in this case is the official opinion, and the immigration court issued this summary for the convenience of the parties.
☐ Both parties waived the issuance of a formal oral decision in this proceeding.

### I.    Removability

The immigration court found Respondent ☑ removable ☐ inadmissible under the following Section(s) of the Immigration and Nationality Act (INA or Act): 212(a)(6)(A)(i).

The immigration court found Respondent ☑ not removable ☐ not inadmissible under the following Section(s) of the Act: 212(a)(7)(A)(i)(I) - withdrawn by DHS on April 1, 2025.

### II.    Applications for Relief

Respondent's application for:

A.  Asylum/Withholding/Convention Against Torture
    ☑ Asylum was ☐ granted ☑ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice
    ☑ Withholding of Removal under INA § 241(b)(3) was ☑ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice
    ☑ Withholding of Removal under the Convention Against Torture was ☐ granted ☐ denied ☐ withdrawn with prejudice ☑ withdrawn without prejudice
    ☐ Deferral of Removal under the Convention Against Torture was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice
    ☐ Respondent knowingly filed a frivolous application for asylum after notice of the consequences. *See* INA § 208(d)(6); 8 C.F.R. §1208.20

B.  Cancellation of Removal

☐ Cancellation of Removal for Lawful Permanent Residents under <u>INA § 240A(a)</u> was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Cancellation of Removal for Nonpermanent Residents under <u>INA § 240A(b)(1)</u> was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

☐ Special Rule Cancellation of Removal under <u>INA § 240A(b)(2)</u> was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

C. Waiver

☐ A waiver under INA § was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

D. Adjustment of Status

☐ Adjustment of Status under INA § was ☐ granted ☐ denied ☐ withdrawn with prejudice ☐ withdrawn without prejudice

E. Other

The Respondent's application for Withholding of Removal under the Convention Against Torture was denied as moot

### III.    Voluntary Departure

☐ Respondent's application for ☐ pre-conclusion voluntary departure under INA § 240B(a) ☐ post-conclusion voluntary departure under INA § 240B(b) was ☐ denied.

☐ Respondent's application for ☐ pre-conclusion voluntary departure under INA § 240B(a) ☐ post-conclusion voluntary departure under INA § 240B(b) was ☐ granted, and Respondent is ordered to depart by            . The respondent must post a $ bond with DHS within five business days of this order. Failure to post the bond as required or to depart by the required date will result in an alternate order of removal to taking effect immediately.

☐ The respondent is subject to the following conditions to ensure his or her timely departure from the United States:

☐ Further information regarding voluntary departure has been added to the record.

☐ Respondent was advised of the limitation on discretionary relief, the consequences for failure to depart as ordered, the bond posting requirements, and the consequences of filing a post-order motion to reopen or reconsider:

If Respondent fails to voluntarily depart within the time specified or any extensions granted by the DHS, Respondent shall be subject to a civil monetary penalty as provided by relevant statute, regulation, and policy. *See* INA § 240B(d)(1). The immigration court has set
☐   the presumptive civil monetary penalty amount of $3,000.00 USD
☐   $ USD instead of the presumptive amount.
If Respondent fails to voluntarily depart within the time specified, the alternate order of removal shall automatically take effect, and Respondent shall be ineligible, for a period of 10 years, for voluntary departure or for relief under sections 240A, 245, 248, and 249 of the Act, to include cancellation of removal, adjustment of status, registry, or change of

nonimmigrant status. *Id.* If Respondent files a motion to reopen or reconsider prior to the expiration of the voluntary departure period set forth above, the grant of voluntary departure is automatically terminated; the period allowed for voluntary departure is not stayed, tolled, or extended. If the grant of voluntary departure is automatically terminated upon the filing of such a motion, the penalties for failure to depart under section 240B(d) of the Act shall not apply.

If Respondent appeals this decision, Respondent must provide to the Board of Immigration Appeals (Board), within 30 days of filing an appeal, sufficient proof of having posted the voluntary departure bond. The Board will not reinstate the voluntary departure period in its final order if Respondent does not submit timely proof to the Board that the voluntary departure bond has been posted.

In the case of conversion to a removal order where the alternate order of removal immediately takes effect, where Respondent willfully fails or refuses to depart from the United States pursuant to the order of removal, to make timely application in good faith for travel or other documents necessary to depart the United States, to present himself or herself at the time and place required for removal by the DHS, or conspires to or takes any action designed to prevent or hamper Respondent's departure pursuant to the order of removal, Respondent may be subject to a civil monetary penalty for each day Respondent is in violation. If Respondent is removable pursuant to INA § 237(a), then he or she shall be further fined or imprisoned for up to 10 years.

## IV.    Removal

☑    Respondent was ordered removed to DEMOCRATIC REPUBLIC OF CONGO.

☐    In the alternative, Respondent was ordered removed to

☐    Respondent was advised of the penalties for failure to depart pursuant to the removal order:

> If Respondent is subject to a final order of removal and willfully fails or refuses to depart from the United States pursuant to the order, to make timely application in good faith for travel or other documents necessary to depart the United States, to present himself or herself at the time and place required for removal by the DHS, or conspires to or takes any action designed to prevent or hamper Respondent's departure pursuant to the order of removal, Respondent may be subject to a civil monetary penalty for each day Respondent is in violation. If Respondent is removable pursuant to INA § 237(a), then he or she shall be further fined or imprisoned for up to 10 years.

## V.    Other

☐ Proceedings were ☐ dismissed ☐ terminated with prejudice
☐ terminated without prejudice ☐ administratively closed.

☐ Respondent's status was rescinded under INA § 246.

☑ Other:

> The docketed hearing location is at the Jena Immigration Court in Louisiana. The Immigration Judge is physically located in Richmond, VA. As the Richmond Immigration Adjudication Center is located in the jurisdiction of the United States Court of Appeals for the Fourth Circuit, the Court applies Fourth Circuit precedent to these proceedings. Herrera-Alcala v. Garland, 39 F.4th 233, 242 (4th Cir. 2022).

An addendum, stating the standards of law and burdens of proof relevant to these issues will be placed in the record of proceedings. That addendum is hereby adopted and incorporated into this decision by reference.

Immigration Judge: Palmer, Brian 06/10/2025

Appeal:    Department of Homeland Security:  ☑ waived    ☐ reserved
Respondent:    ☐ waived    ☑ reserved
Appeal Due: 07/10/2025

## Certificate of Service

This document was served:
Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service | [ U ] Address Unavailable
To: [ ] Noncitizen | [ M ] Noncitizen c/o custodial officer | [ E ] Noncitizen's atty/rep. | [ E ] DHS
Respondent Name : ███████████████████ | A-Number : ███████
Riders:
Date: 06/11/2025 By: Victoria Sparks, Court Staff



Address: ████████████

October 2, 2025

U.S. Department of Homeland Security
Immigrations and Customs Enforcement
1010 East Whatley Rd
Oakdale, Louisiana 71463

To Whom It May Concern,

    I am writing in support of my ████████████████████ as part of

her parole and immigration case. I am committed to serving as her sponsor and providing her

with the support and stability she needs upon her release. I am currently employed as a ███

███ at ██████████ where I have worked since ████ My position provides me

with a steady income, and I am financially able to assist █████ as she transitions back into the

community. I also maintain stable housing and am prepared to provide her with a safe and

welcoming home environment.

    Beyond my work, there is strong support from the entire family as well. As her ██████

and sponsor, I will help her attend all required legal and immigration appointments, assist with

her daily needs, and ensure that she has the opportunity to reintegrate into society in a positive

and responsible manner. My family and I are ready to welcome her with open arms and provide

the emotional and practical support necessary for her success. Thank you for considering my

letter of sponsorship. Please feel free to contact me if any further information is needed.

Sincerely,



October 2, 2025

U.S. Department of Homeland Security
Immigrations and Customs Enforcement
1010 East Whatley Rd
Oakdale, Louisiana 71463

RE: Letter of Support for █████████████

To Whom It May Concern:

I am writing this letter in support of ████████████ who is currently being held at Ridgewood Correctional Center. I respectfully request that you consider releasing her, as I believe she poses no threat to the community and will comply with all court requirements.

I have known ██████ and have been in communication with her since ████████ and can attest to her good character, strong work ethic, and dedication to her family. In our communication, she has always demonstrated honesty, kindness, and responsibility. If released, ███████ will have a stable place to live, and I will personally assist her in adjusting to life in the United States and finding employment.

I respectfully ask that you consider ████████ character in making your decision. I am confident that if released, she will be a positive and responsible member of the community. Thank you for your time and consideration.

Sincerely,

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| ██████████████ | **Attorney Affirmation of** |
| v. | **Emlyn Medalla, Esq.** |
| Donald J. Trump, et al. | |

I, Emlyn Medalla, do affirm and swear the following:

1. My name is Emlyn Medalla, I am an attorney of good standing under the New York Second Appellate Division. I am a staff attorney at the Anti-Trafficking Initiative at Sanctuary for Families, a nonprofit that serves survivors of gender violence.

2. I am one of the attorneys for the above-named Plaintiff ("Ms. ██████") and am thus familiar with the facts and circumstances of her case.

3. I write this affirmation in support of Ms. ██████ petitioning for this instant habeas action. Specifically, I write this affirmation to detail my attempts to communicate with Immigration and Customs Enforcement ("ICE") and ICE's refusal to engage Ms. ██████ counsel.

4. Around June 24, 2025 I became Ms. ██████ attorney.

5. On June 24, 2025, I called Richwood Correctional Center three times. I called KenShauna Blade, CDPO/ICE Contract Detention Processing Officer on her phone and mobile numbers. I called CDPO Drayton, CDPO/ICE Contract Detention Processing Officer. For most of these call attempts, I was unable to reach the officer and there was no opportunity to leave a message. When I did reach an officer, I asked to schedule meetings with Ms. ██████ and for information regarding her deportation officers. They

were able to set me up with video calls with my client, but did not share information about her deportation officers.

6. On June 27, 2025, I submitted a G-28 and an advocacy letter to New Orleans Field Office informing ICE that our office represents Ms. ███████ and requesting the status of ICE's third country determination.

7. I received no response.

8. On June 27, 2025, I called Richwood Correctional Center, the Office of the Principal Legal Advisor of New Orleans in Jena, the Office of the Principal Legal Advisor of New Orleans in Oakdale, and the New Orleans Field Office. I attempted to reach these offices to inquire about updates to Ms. ███████ case and the status of any third country removal.

9. No one answered my calls. I received no response.

10. Richwood Correctional Center provided me two numbers to try calling. The numbers they gave me were to the offices I previously tried calling. I tried calling the numbers again that day.

11. No one answered my calls. I received no response.

12. On June 28, 2025, I tried calling the above office phone numbers again to inquire about case updates, deportation officer assignments, and status of third country removal for Ms. ███████

13. No one answered my calls. I received no response.

14. On June 30, 2025, I tried to call the New Orleans Field Office and the Office of the Principal Legal Advisor of New Orleans in Oakdale. Again, I attempted to reach these offices to inquire about updates to Ms. █████████ case and the status of any third country removal.

15. I was able to get in touch with an ICE ERO agent named Emma (last name unknown) who told me that she could not share Ms. █████████ detention officers with me, and that she did not have any information to provide me. She recommended that I call the field office. When I requested the phone number, she provided the same phone numbers that I had been calling.

16. No one else answered my calls. I received no response.

17. On July 1, 2025, I tried to call the numbers again. I tried to inquire about case updates, deportation officer assignments, and status of third country removal for Ms. █████████

18. No one answered my calls. I received no response.

19. On July 3, 2025, in a virtual meeting with Ms. █████████ I advised her to request the names of her ICE case officers.

20. On July 10, 2025, Ms. █████████ directly provided me with two email addresses that she was informed were email addresses of her ICE case officers. Later that day, I submitted the same documents and a sworn statement by Ms. █████████ to New Orleans Field Office general email, and the two ICE case officers that Ms. █████████ was told were responsible for her case. I sought case updates and status of third country removal for Ms. █████████

21. I received an automatic reply of no substance. I received no other response.

22. On July 27, 2025, New Orleans Outreach Team responded to my correspondence, informing me that they contacted Ms. ███████ ICE case officers. They provided the contact information of two case officers that did not match the case officers that Ms. ███████ was told were assigned to her. New Orleans Outreach also informed me that these case officers were contacting Guatemalan representatives to "Request Acceptance of Alien."

23. This reply marks the singular reply that I received with any case status information.

24. On August 11, 2025 I sent a letter to New Orleans Field Office general email, and ICE case officers Tyler Vanzandt and Hanna McBride expressing Ms. ███████'s fear of removal to Guatemala. I shared our office's request to release Ms. ███████ based on her detention since ██████ 2025 despite being granted the protection called Withholding. I requested updates and responses regarding Ms. ███████ case and the status of third country removal.

25. I received an automatic reply of no substance. I received no other response.

26. On August 26, 2025, I requested passport style pictures of Ms. ███████ for her I-765 Application for Employment Authorization, which she is eligible for as a recipient of a grant of Withholding, so that upon release from ICE custody she may immediately find gainful employment and be a self-sufficient member of the community.

27. New Orleans Field Office general email responded to my correspondence on September 29, 2025, with the photo they have on file for Ms. ████████ to include in her Application for Employment Authorization.

28. I received no other response to requests for case updates in the same email thread.

29. On October 6, 2025, I mailed Ms. ████████ documents for her Custody Review, respectfully requesting that ICE find in support of Ms. ████████ release from custody.

30. I received no response.

31. On October 8, 2025, I emailed the New Orleans Field Office general email, ICE case officers Tyler Vanzandt, and Hanna McBride Ms. ████████s documents for her Custody Review, respectfully requesting that ICE find in support of Ms. ████████ release from custody.

32. I received no response.

33. On October 24, 2025, Ms. ████████ informed me that she asked an ICE case officer in the detention center for updates to her case and how long she would be detained. Ms. ████████ reported that the ICE case officer stated that "due to constant changes in laws and policies," they "could not answer." When Ms. ████████ asked the ICE agent whether she would be detained "forever," the ICE case officer reportedly responded by saying "no," and that ICE is "unable to keep detainees indefinitely." The ICE agent told Ms. ████████ that they "couldn't share" when she would be released.

34. She was given no other information about her case.

35. On October 29, 2025, I emailed the New Orleans Field Office general email, ICE case officers Tyler Vanzandt, and Hanna McBride to share the notice requesting Ms. ████████ biometrics in response to her I-765 Application for Employment Authorization. I requested that ICE share Ms. ████████ biometric information with USCIS to be in compliance with the biometrics request and in furtherance of her obtaining employment authorization so that upon release she may find gainful employment and be a self-sufficient member of the community.

36. I received no response.

37. Because the only reliable way to communicate with ICE was for Ms. ████████ herself to ask ICE case officers onsite at the detention facility, on October 30, 2025, I advised Ms. ████████ to attend "ICE office hours" in the detention facility to share our request for biometrics and ask for an update to her case.

38. On November 6, 2025, Ms. ████████ informed me that she requested ICE agents to send her biometric information, but was told that she is "still a detainee" and they "cannot help her."

39. She was given no other information about her case.

40. On November 25, 2025, Ms. ████████ informed me that she was next to another detainee when they asked an ICE case officer when they would be released based on their grants of Withholding. Ms. ████████ shared with me that the ICE case officer reportedly told them that they "have to file petitions" because "the President isn't releasing anyone," so "if they wait to be released, it would be a losing battle." The agent informed them that

the process "would be faster" if the detainees "filed something in court." The agent told

them that if detainees "wait on ICE for release," they will be detained "for a long time."

41. She was given no other information about her case.

42. On January 6, 2026, I submitted a Freedom of Information Act (FOIA) request to U.S.

Immigration and Customs Enforcement for Ms. ███████ A-file in order to obtain

information about her case.

43. On January 7, 2026, the ICE FOIA Office responded to our request, informing our office

that the information we are seeking is under the purview of the U.S. Citizenship and

Immigration Services (USCIS). The ICE FOIA Office referred our request to USCIS for

processing.

44. To date, I have received no FOIA results and no other communication from ICE.


[SIGNATURE PAGE FOLLOWS]

Dated: 2/4/26

Emlyn Medalla

Staff Attorney

Anti-Trafficking Initiative

Sanctuary for Families

# EXHIBIT G

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**

████████████████

v.                                                    **Attorney Affirmation of**
Donald J. Trump, et al.                               **Whitney Hood, Esq.**

I, Whitney Hood, do affirm and swear the following:

1.  My name is Whitney Hood, I am an attorney of good standing under the New York
    Second Appellate Division and am admitted to the Southern District of New York. I am
    the Associate Director of the Anti-Trafficking Initiative at Sanctuary for Families, a
    nonprofit that serves survivors of gender violence.

2.  I am one of the attorneys for the above-named Plaintiff ("Ms. █████ and am thus
    familiar with the facts and circumstances of her case.

3.  I write this affirmation in support of Ms. █████ petitioning this instant habeas action.

4.  Ms. █████ is an extraordinary woman. At age 14 she was sold in the Democratic
    Republic of the Congo into a forced marriage and labor trafficked, raped, beaten,
    tortured; and she survived. She bore four children, all the product of rape by her husband.
    As his sixth "wife," she was forced into domestic servitude. When she escaped back to
    her family, her powerful politician husband found her, beat her and her brother, shot her
    father dead in front of her, and burned the family house to the ground. Her family
    scattered, fleeing for their literal lives. The first country she fled to, Brazil, was not safe
    because her husband and persecutor located her and threatened to kill her. She then fled
    through Central America to the United States, the only place she feels safe. She has lived

through extensive trauma, and despite that, she smiles on video calls with me and tells me how she's learning to make bracelets in ICE detention. She reads her Bible and leads Bible study among other women in her detention facility. She finds a way to continue to hold onto hope. She hopes for the safety of her children, whose whereabouts are unknown to her because their father, her husband, is seeking to kill them and so they are in hiding, even to her. She hopes for the safety of her brother, who was kidnapped in Mexico by a cartel and she has not seen him since. She hopes for her future education to be able to study medicine, to work as a nurse, and one day to run an orphanage. She hopes to see the outside of the detention facility where she has lived in the United States of America for 13 months: January 2025 to now. She hopes that this country will live up to its ideals of respect for human rights.

5. Ms. ████ came to this country to seek asylum and other protection -- which she won. On her own. Without a lawyer. She was granted what is called "Withholding of Removal," similar to asylum in that she proved it was more likely than not that she would be persecuted on account of a protected ground if she were removed to the Democratic Republic of Congo and that the government there was unable or unwilling to protect her. I learned about Ms. ████ after she had won her case. My organization, Sanctuary for Families, which represents survivors of gender violence, then agreed to represent her. Some of the proceedings involved are explained here below.

6. We have advocated for the release of Ms. ████ during two Custody Review Determinations. It is my understanding of reviewing her immigration file that she has not been afforded a bond hearing.

7.  Around October 9, 2025, during a video call with Ms. ███████ she informed me of the decision of her Custody Review because an ICE case officer visited her in detention and delivered the decision verbally. Not my colleagues nor my office received any communication from ICE directly, despite months of communication attempts to a variety of ICE offices, officers, phone numbers and emails. Ms. ███████ is an excellent candidate for release: she has zero criminal history, an exemplary record in detention (leading Bible studies, for one), education and a strong desire to work. She suffers no known illnesses including any mental illness that would pose a threat to safety or property. Ms. ██████ is kind, wishes to find a church congregation to accept her, and find a steady job – eventually, she would like to work as a nurse and even run an orphanage.

8.  She was denied release.

9.  No reason was given for the denial.

10. To date, I am aware of no fewer than twenty-five (25) attempts by my colleague or myself made to ICE in efforts to communicate as her counsel on her case.

11. To date, I am aware of one (1) response communication from ICE.

12. On January 21, 2026, I received a communication from the Japanese Consulate declining permission for Ms. ██████ to be removed there. Through her counsel, Ms. ███████ has sought to comply with ICE's attempts to remove her to a third country.

13. At 11 p.m. on Saturday, February 14, 2026 I was notified via a family member that Ms. ███████ had been told she was being "moved." She reportedly did not have any

information or know whether this "move" was a transfer to a different facility or a removal to a third country.

14. At 11:20 p.m. on Saturday, February 14, 2026 my colleague contacted and cc'ed me the following: NewOrleans.Outreach@ice.dhs.gov; Tyler J Vanzandt who had previously been identified as Ms. ███████ ICE Deportation Officer; Hannah W Mcbride Vanzandt who had previously been identified as Ms. ███████ ICE Deportation Officer ; Lacy B Kaham Vanzandt who had previously been identified as Ms. ███████ ICE Deportation Officer; and Hay A Johnstone Vanzandt who had previously been identified as Ms. ███████ ICE Deportation Officer. No automatic-replies that they no longer work for ICE or were out of office were received. We asserted that no notice and opportunity had been met and any removal to a third country violates Ms. ███████ rights.

15. We received no response.

16. At 8 a.m. on Sunday, February 15, 2026 I checked the ICE Detainee Locator (https://locator.ice.gov/odls/#/search) and searched Ms. ███████ A number (her ICE case number). She appeared to be detained at Richwood Detention Facility. The same information was available at 8:30 a.m., 9 a.m. and 9:30 a.m.

17. By 10 a.m. Ms. ███████ disappeared from the ICE Detainee Locator system. My office made a total of 20calls to 8 different personal ICE Officer numbers, Field Offices, and detention facilities.

18. Around 1 p.m. Craig Lee, and ICE Officer, answered the phone and upon verifying that we were counsel of record and had a G-28 Notice of Appearance in the system, shared that at 4 a.m. Ms. ██████ was put on a flight to Senegal, Cameroon, Chad. Ghana, or Nigeria. He could not identify which country was her destination. He could not answer why no notice and opportunity had been given to Ms. ██████ nor could he provide an answer as to why counsel was not notified. He provided William M Saunders and Charles G Ward's email addresses and informed us that "if anyone had more information, it would be them."

19. At 1:24 p.m. my office contacted those individuals and all prior personal and field office ICE contact emails and reiterated that her removal violates law and policy, seeking information about her whereabouts and wellbeing, and seeking remedial steps.

20. I never received a reply.

Dated:  February 15, 2026        /s/   Whitney Hood
                                 Whitney Hood, Esq.
                                 Associate Director
                                 Anti-Trafficking Initiative
                                 Sanctuary for Families

# EXHIBIT H

1/17/26, 12:18 PM Making America Safe Again: U.S. Citizenship and Immigration Services End-of-Year Review Demonstrates Impact of Rigorous Im...

Case 3:26-cv-00473 Document 1-1 Filed 02/16/26 Page 72 of 94 PageID #: 86



U.S. Citizenship and Immigration Services

MENU

Home > Newsroom > All News > News Releases > Making America Safe Again: U.S. Citizenship and Immigration Services End-of-Year Review Demonstrates Impact of Rigorous Immigration Crackdown

# Making America Safe Again: U.S. Citizenship and Immigration Services End-of-Year Review Demonstrates Impact of Rigorous Immigration Crackdown

Release Date : 12/22/2025

*Under the leadership of Secretary of Homeland Security Kristi Noem and USCIS Director Joseph Edlow, the agency has enhanced immigration screening and vetting protocols to protect communities and national security and has advanced immigration policies that put the national interest first.*

**WASHINGTON**— As the end of 2025 approaches, U.S. Citizenship and Immigration Services would like to highlight key accomplishments for the year, including enhanced screening and vetting of aliens, increased coordination with our Department of Homeland Security immigration enforcement partners, and common-sense regulatory and policy changes that restore integrity to America's immigration system. Explore the highlights in this infographic.

"With Secretary Noem in charge of homeland security, USCIS has taken an 'America First' approach, restoring order, security, integrity, and accountability to America's immigration system, ensuring that it serves the nation's interests and protects and prioritizes Americans over foreign nationals," said USCIS Director Joseph B. Edlow. "The Biden administration spent four years dismantling, exploiting, and undermining America's immigration system, flooding our country with criminal aliens. Under President Trump and Secretary Noem's leadership, our border is secure, integrity has been restored to our immigration system, and the safety of our homeland comes first."

### Protecting American Communities from Threats to Public Safety and National Security

"Protecting Americans is at the center of everything we do at USCIS. We are committed to safeguarding public safety and national security by making sure every alien undergoes the most rigorous vetting and screening processes possible," said Edlow.

Within hours of the Nov. 26 attack where an Afghan national murdered one Nation[al] [Guard member and] severely wounded another, Secretary Noem directed USCIS to put asylum processi[ng on hold.]

Need Help?
Chat with Emma™

1/17/26, 12:18 PM    Making America Safe Again US Citizenship and Immigration Services End-of-Year Review Demonstrates Impact of Rigorous Im…

Case 3:26-cv-00473    Document 1-1    Filed 02/16/26    Page 73 of 94 PageID #: 87

every country, implemented a full-scale reexamination of every Green Card for aliens from every presidentially designated high-risk country, and placed a hold on the processing of immigration applications and petitions for all Afghan nationals and aliens from those countries of concern. The agency also implemented critical national security measures requiring USCIS officers to consider negative country-specific factors when vetting aliens from those 19 high-risk countries, ensuring that USCIS can more meaningfully assess whether an alien is a threat to public safety or national security.

With the support of Secretary Noem, USCIS announced the creation of a new vetting center on Dec. 5 to enhance screening and vetting of immigration applications, with a focus on identifying terrorists, criminal aliens, and other threats to public safety. The center will leverage advanced technologies and work closely with law enforcement and intelligence partners to strengthen national security and uphold the integrity of the U.S. immigration system.

USCIS has referred over 14,400 aliens to U.S. Immigration and Customs Enforcement since Jan. 20 for public safety, national security, and fraud concerns, including 182 aliens who were confirmed or suspected to be national security risks. With guidance from Secretary Noem, the agency has been **actively collaborating with other agencies on immigration enforcement and public safety efforts**, resulting in over 2,400 arrests at USCIS field offices since Jan. 20.

USCIS has begun recruiting Homeland Defenders, who will better support the agency's mission and **bolster efforts to combat fraud and other threats**. Since launching the hiring campaign on Sept. 30, USCIS has received more than 50,000 applications — the highest in agency history. The first Homeland Defenders began reporting for duty in early December 2025.

USCIS is exercising **new law enforcement authorities** delegated by Secretary Noem and is hiring a new team of special agents who will investigate and refer immigration law violators for prosecution.

Under an updated policy confirming USCIS' role as an immigration enforcement agency, the agency's officers are once again empowered to enforce immigration law by issuing Notices to Appear. And, they have done so in **historic numbers**.Since Jan. 20, USCIS officers have issued approximately 196,600 Notices to Appear to place aliens in removal proceedings.

USCIS has also aligned immigration policy with American values, issuing policy guidance (PDF, 325.81 KB) emphasizing that **there is no room in America for aliens who espouse anti-American ideologies or support terrorist organizations**.

USCIS **launched an online process for aliens to finally comply with a longstanding alien registration requirement** that helps the government track and manage their presence to more effectively enforce immigration law, supporting national security and public safety efforts.

*Declaring War on Fraud, Addressing Vulnerabilities, and Closing Loopholes*

Director Edlow, with backing from Secretary Noem, has **declared war on immigration fraud**. Under his leadership, USCIS is committed to pursuing those who exploit, abuse, and undermine the integrity of the immigration system. There were more fraud referrals to law enforcement in the past year than under the entirety of the Biden administration. Since Jan. 20, USCIS officers have made over 29,000 fraud referrals to the USCIS Fraud Detection and National Security (FDNS) Directorate. FDNS has completed investigations on more than 19,300 fraud cases and identified fraud in 65% of them. FDNS also completed more than 6,500 site visits and conducted over 19,500 social media checks of aliens' online posts, looking for national security, fraud, and anti-American concerns.

These enhanced measures, along with other policies implemented by Secretary Noem across the Department of Homeland Security, were instituted to protect American communities from potential threats, reinforce the integrity of the U.S. immigration system, and ensure USCIS only approves immigration applications and petitions for qualified aliens.

USCIS made history with its **fraud investigation** Operation Twin Shield, the agency's largest enforcement operation to date. Launched in the Minneapolis-St. Paul area, this targeted operation uncovered everything from marriage fraud to misuse of H-1B work visas and student visas, and even identified an alien with ties to terrorism who was later detained by ICE. USCIS focused on more than 1,000 cases that had fraud or ineligibility indicators, attempted over 2,000 site visits to homes and workplaces, and completed nearly 1,500 in-person interviews with aliens during the operation. USCIS found evidence of fraud, noncompliance with immigration law, or public safety or national security concerns in hundreds of cases. Operation Twin Shield has so far led to the denial of immigration benefits, the issuance of numerous Notices to Appear, and nearly a dozen arrests by ICE. USCIS also gained significant intelligence and evidence that can be used to ensure greater accountability and justice in the ensuing months. This is just one of the many successful operations conducted across DHS under Secretary Noem's leadership.

USCIS also acted quickly to close policy loopholes and address program vulnerabilities.

The agency strengthened [policy guidance (PDF, 312.02 KB)](#) to ensure **there is no legal defense for a false claim of U.S. citizenship**, with USCIS officers only considering age or mental capacity to assess if a claim was made intentionally to gain a government benefit. Falsely claiming U.S. citizenship allows aliens unlawful access to services and privileges reserved only for American citizens.

The agency **enhanced screening measures** to vet marriages and family relationships to ensure they are genuine, verifiable, and compliant with all applicable laws. Aliens seeking legal immigration status through [family relationships (PDF, 474.78 KB)](#) or [marriage (PDF, 313.05 KB)](#) must prove their relationship is genuine and not a scheme for immigration fraud.

USCIS changed its regulation to ensure that aliens will **no longer receive an automatic extension of their employment authorization** when seeking renewal in certain employment authorization categories. This ensures that the government is not automatically allowing aliens to work in the U.S. without further screening and vetting.

1/17/26, 12:18 PM    Making America Safe Again: US Citizenship and Immigration Services End-of-Year Review Demonstrates Impact of Rigorous Im…

Case 3:26-cv-00473    Document 1-1    Filed 02/16/26    Page 75 of 94 PageID #: 89

The agency **reduced the [maximum validity period for certain employment authorization documents](#) (PDF, 409.79 KB)** from 5 years to 18 months to ensure more frequent vetting and screening of aliens. This change strengthens our ability to deter fraud and identify individuals with potentially harmful intent and addresses the security risks posed by the previous lengthy validity period.

### *Ending Exploitation of Immigration Programs*

USCIS is advancing the administration's and Secretary Noem's goal of **ending the abuse and exploitation in certain immigration programs**. This includes stopping broad abuse of humanitarian parole authority and terminating the family reunification and the Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) parole programs. Parole was never intended to be used in this way, and DHS is returning parole to a case-by-case basis as intended by Congress.

Temporary Protected Status (TPS) was always meant to be temporary, and the agency is **ending the exploitation and abuse of TPS** by ensuring that it is only granted as intended by Congress. Secretary Noem ended TPS for Afghanistan, Burma, Cameroon, Ethiopia, Haiti, Honduras, Nepal, Nicaragua, South Sudan, Syria, and Venezuela.

USCIS continues to encourage aliens whose parole or TPS was terminated to use the U.S. Customs and Border Protection [CBP Home app](#) to report their departure from the United States.

### *Upholding the Integrity of the Naturalization Process*

On Sept. 17, USCIS announced a [revised version of the naturalization test](#) that expanded the question bank from 100 to 128 questions, increased the number of questions on each test from 10 to 20, raised the passing score from 6 to 12 correct responses, and revised the questions to ensure the test provides a more meaningful assessment of the alien's knowledge and understanding of U.S. history and government. Naturalization is a privilege, and the new test **reinforces the integrity of the naturalization process** by ensuring that new citizens understand the rights and responsibilities that come with this privilege.

Pursuant to long-neglected statutory authority, USCIS also **restored the practice of conducting neighborhood investigations** of potential new citizens. The purpose of a neighborhood investigation is to verify aliens' eligibility for naturalization by reviewing their residency, moral character, loyalty to the U.S. Constitution, and commitment to the nation's well-being. These investigations are vital to maintaining the integrity of the naturalization process, assuring assimilation, and safeguarding the value of American citizenship. The agency began conducting neighborhood investigations in November 2025.

USCIS is also **[holding aliens accountable when they falsely claim U.S. citizenship](#) (PDF, 359.87 KB)** for any reason during the naturalization process. This reinforces the fundamental principle that lying about being a U.S. citizen, including in an attempt to vote in elections, is a clear violation of good moral character that will not be tolerated and will lead to the denial of a naturalization application.

### *Putting American Communities and Workers First*

USCIS is **ensuring the integrity of America's electoral process** by combating voter fraud and preventing aliens from voting. The agency launched enhancements to the Systematic Alien Verification for Entitlements (SAVE) service that allow states to verify citizenship using the last four digits of Social Security numbers, run queries in bulk, and use SAVE at no charge. And by allowing states to review and verify their voter rolls, this administration is doing more to ensure the integrity of elections than any previous administration. Since these changes, SAVE has processed over 48 million voter verification queries, with 24 states signing memorandums of agreement for voter verification with USCIS.

USCIS is also ensuring that voter registration services (PDF, 310.96 KB) at administrative naturalization ceremonies remain strictly nonpartisan and are conducted only by state and local election officials. This practice **reinforces the integrity of the naturalization process** and safeguards the impartiality of voter registration for America's newest citizens.

USCIS is **cracking down on public benefits abuse**. On Sept. 4, the agency reaffirmed long-standing policy that aliens in the United States should be self-reliant and government benefits should not incentivize immigration. On Sept. 25, USCIS also reminded (PDF, 234.87 KB) individuals who contractually agree to financially sponsor an alien that they can be sued to recover the cost of any benefits an alien they sponsor accesses.

Additionally, DHS proposed a rule on Nov. 19 to rescind the 2022 Public Charge final rule and restore USCIS' discretion when making a determination whether an alien seeking legal status in the United States would become reliant on government assistance. To further preserve public benefits and support the identification of potential fraud, federal agencies responsible for providing oversight to benefit-granting agencies ran nearly 206 million SAVE queries during calendar year 2025.

Since July 2025, USCIS has been **implementing the new fees** established under President Trump's One Big Beautiful Bill Act, enacted by Congress as H.R. 1, collecting millions of dollars to pay down the national debt and fund additional immigration enforcement resources.

DHS proposed a new rule to **prioritize allocation of H-1B visas** to higher-skilled and higher-paid aliens, which will better protect wages, working conditions, and job opportunities for American workers.

DHS published a critical final rule enabling USCIS to streamline the process for agricultural work visas that **supports America's vital agricultural industry**.

**Getting Results for America**

"USCIS' end-of-year review demonstrates enforcement actions and policy changes that crack down on immigration fraud, strengthen vetting, and protect American communities. These efforts underscore President Trump and Secretary Noem's commitment to restoring integrity and putting national security and the interests of Americans first," said Edlow.

For more information on USCIS and its programs, please visit [uscis.gov](uscis.gov) or follow us on [X](X), [Instagram](Instagram), [YouTube](YouTube), [Facebook](Facebook) and [LinkedIn](LinkedIn).

Last Reviewed/Updated: 12/22/2025

EXHIBIT I

PLAINTIFFS' EXHIBIT NO. 2

CASE NO. ___ PX 25-951

IDENTIFICATION: ___ JUL 1 0 2025

ADMITTED: ___ JUL 1 0 2025

**To All ICE Employees**
**July 9, 2025**

**Third Country Removals Following the Supreme Court's Order in** *Department of*
*Homeland Security v. D.V.D.*, **No. 24A1153 (U.S. June 23, 2025)**

On June 23, 2025, the U.S. Supreme Court granted the Government's application to stay the
district court's nationwide preliminary injunction in *D.V.D. v. Department of Homeland Security*,
No. 25-10676, 2025 WL 1142968 (D. Mass. Apr. 18, 2025), which required certain procedures
related to providing a "meaningful opportunity" to assert claims for protection under the
Convention Against Torture (CAT) before initiating removal to a third country. Accordingly, all
previous guidance implementing the district court's preliminary injunction related the third
country removals issued in *D.V.D.* is hereby rescinded. Absent additional action by the Supreme
Court, the stay will remain in place until any writ of certiorari is denied or a judgment following
any decision issues.

Effective immediately, when seeking to remove an alien with a final order of removal—other
than an expedited removal order under section 235(b) of the Immigration and Nationality Act
(INA)—to an alternative country as identified in section 241(b)(1)(C) of the INA, ICE must
adhere to Secretary of Homeland Security Kristi Noem's March 30, 2025 memorandum,
*Guidance Regarding Third Country Removals*, as detailed below. A "third country" or
"alternative country" refers to a country other than that specifically referenced in the order of
removal.

If the United States has received diplomatic assurances from the country of removal that aliens
removed from the United States will not be persecuted or tortured, and if the Department of State
believes those assurances to be credible, the alien may be removed without the need for further
procedures. ICE will seek written confirmation from the Department of State that such
diplomatic assurances were received and determined to be credible. HSI and ERO will be made
aware of any such assurances. In all other cases, ICE must comply with the following
procedures:

- An ERO officer will serve on the alien the attached Notice of Removal. The notice
  includes the intended country of removal and will be read to the alien in a language he or
  she understands.
- ERO will <u>not</u> affirmatively ask whether the alien is afraid of being removed to the
  country of removal.
- ERO will generally wait at least 24 hours following service of the Notice of Removal
  before effectuating removal. In exigent circumstances, ERO may execute a removal order
  six (6) or more hours after service of the Notice of Removal as long as the alien is
  provided reasonable means and opportunity to speak with an attorney prior to removal.
  - Any determination to execute a removal order under exigent circumstances less
    than 24 hours following service of the Notice of Removal must be approved by
    the DHS General Counsel, or the Principal Legal Advisor where the DHS General
    Counsel is not available.

- If the alien <u>does not</u> affirmatively state a fear of persecution or torture if removed to the country of removal listed on the Notice of Removal within 24 hours, ERO may proceed with removal to the country identified on the notice. ERO should check all systems for motions as close in time as possible to removal.
- If the alien <u>does affirmatively state</u> a fear if removed to the country of removal listed on the Notice of Removal, ERO will refer the case to U.S. Citizenship and Immigration Services (USCIS) for a screening for eligibility for protection under section 241(b)(3) of the INA and the Convention Against Torture (CAT). USCIS will generally screen the alien within 24 hours of referral.
  - o USCIS will determine whether the alien would more likely than not be persecuted on a statutorily protected ground or tortured in the country of removal.
  - o If USCIS determines that the alien has not met this standard, the alien will be removed.
  - o If USCIS determines that the alien has met this standard and the alien was not previously in proceedings before the immigration court, USCIS will refer the matter to the immigration court for further proceedings. In cases where the alien was previously in proceedings before the immigration court, USCIS will notify the referring immigration officer of its finding, and the immigration officer will inform ICE. In such cases, ERO will alert their local Office of the Principal Legal Advisor (OPLA) Field Location to file a motion to reopen with the immigration court or the Board of Immigration Appeals, as appropriate, for further proceedings for the sole purpose of determining eligibility for protection under section 241(b)(3) of the INA and CAT for the country of removal. Alternatively, ICE may choose to designate another country for removal.

Notably, the Supreme Court's stay of removal does not alter any decisions issued by any other courts as to individual aliens regarding the process that must be provided before removing that alien to a third country.

Please direct any questions about this guidance to your OPLA field location.

Thank you for all you continue to do for the agency.


Todd M. Lyons
Acting Director
U.S. Immigration and Customs Enforcement


Attachments:

- U.S. Supreme Court Order
- Secretary Noem's Memorandum
- Notice of Removal

EXHIBIT J

U.S. Department of Justice

Immigration and Naturalization Service

HQCOU 50/1.1

Office of the General Counsel

*425 I Street NW*
*Washington, DC 20536*

APR 2 1 2000

MEMORANDUM FOR Regional Counsel
For Distribution to District and Sector Counsel

FROM:    Bo Cooper
         General Counsel

SUBJECT:    Detention and Release during the Removal Period of Aliens Granted
            Withholding or Deferral of Removal

Section 241(a)(1) of the Immigration and Nationality Act (INA) establishes a 90-day "removal period" that generally commences on the date a removal order becomes administratively final. Certain aliens are subject to mandatory detention by the INS during this removal period. This memorandum addresses the authority of the Immigration and Naturalization Service (INS) under certain circumstances to release an alien who has a final order of removal, and who has also been granted withholding or deferral of removal, before the 90 day removal period has expired.

Under INA section 241(a)(2), once the removal period has begun, the INS may -- but is not required to -- detain a non-criminal alien until removal is effected. Section 241(a)(2) generally requires the INS to detain all terrorists, all aggravated felons, and most other criminal aliens during the removal period and during any extension of the removal period. Please see HQCOU's March 16, 2000 memorandum entitled " Detention and Release of Aliens with Final Orders of Removal" for a more detailed interpretation of these provisions. Under certain circumstances, however, there is authority for the INS to release an alien who has been finally granted withholding or deferral of removal when the INS is not actively pursuing the alien's removal, even though the alien would otherwise be subject to mandatory detention.

An alien who has been finally granted withholding of removal to a specific country under INA section 241(b)(3), or who has been granted either withholding or deferral of removal to a specific country under the Convention Against Torture, remains an alien who is subject to a final

Memorandum for Regional Counsel
Page 2

order of removal. Generally, the INS may execute that order to any country other than the country to which removal has been withheld or deferred. Thus, if the INS is actively pursuing removal to an alternate country, there is no authority during the removal period to release an alien who is subject to mandatory detention. The purpose of the removal period, however, is to facilitate the execution of the removal order. If, therefore, an alien has been finally granted withholding or deferral of removal and the INS is not actively pursuing the alien's removal to an alternate country, the INS has authority to consider the release of such an alien during the removal period. This means only that there is authority to consider release of such aliens; it does not mandate their release. The decision whether or not to release such an alien must take into consideration all appropriate factors, including whether the alien poses a threat to the community or flight risk.

1

*Office of the Assistant Secretary*
**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536



U.S. Immigration
and Customs
Enforcement

FEB 9 2004

MEMORANDUM FOR: Anthony Tangeman
Deputy Executive Associate Commissioner
Office of Detention and Removal

FROM: Michael J. Garcia
Assistant Secretary

SUBJECT: Detention Policy Where an Immigration Judge has Granted
<u>Asylum and ICE has Appealed</u>

This memorandum reiterates the U.S. Immigration and Customs Enforcement (ICE) policy where the immigration court has granted asylum (or other protection relief, such as withholding of removal or protection under the Convention Against Torture) and ICE has entered an appeal of the decision which is pending before the Board of Immigration Appeals.

In general, it is ICE policy to favor release of aliens who have been granted protection relief by an immigration judge, absent exceptional concerns such as national security issues or danger to the community and absent any requirement under law to detain.

For cases where a bond has been required but not posted, the bond should be reviewed following an immigration judge's grant of asylum so that an alien can be released in accordance with this ICE policy. Arriving aliens should be considered for parole.

In all cases, the Field Office Director must approve a decision to keep an alien granted protection relief in custody pending appeal, in consultation with the Chief Counsel. This review cannot be delegated beyond the Field Office Director or anyone acting in that capacity.

If you have any questions regarding this memorandum, please contact your local Chief Counsel.

cc: Victor Cerda
Acting Principal Legal Advisor

## Strait, Andrew R

| | |
|---|---|
| **From:** | ERO Taskings |
| **Sent:** | Tuesday, March 06, 2012 12:15 PM |
| **Subject:** | Reminder on Detention Policy Where an Immigration Judge has Granted Asylum, Withholding of Removal or CAT |

*The following message is being sent on behalf of Gary Mead, Executive Associate Director, Enforcement and Removal Operations:*

**To:  Assistant Directors, Field Office Directors, Deputy Field Office Directors, and Assistant Field Office Directors**

**Subject:  Reminder on Detention Policy Where an Immigration Judge has Granted Asylum, Withholding of Removal or CAT**

This Field Guidance is sent as a reminder that the April 21, 2000 Immigration and Naturalization Service Memorandum by General Counsel Bo Cooper (*Detention and Release during the Removal Period of Aliens Granted Withholding or Deferral of Removal*) and the February 9, 2004 ICE Memorandum by Assistant Secretary Michael Garcia (*Detention Policy Where an Immigration Judge Has Granted Asylum and ICE Has Appealed*) are still in effect and should be followed.

The memorandum provides guidance that "[i]n general, it is ICE policy to favor release of aliens who have been granted protection relief by an immigration judge, absent exceptional concerns such as national security issues or danger to the community and absent any requirement under law to detain." Protection relief includes asylum, withholding of removal under section 241(b)(3) of the Immigration and Nationality Act, and withholding or deferral of removal under the regulations implementing U.S. obligations under Article 3 of the U.N. Convention Against Torture and Cruel, Inhuman or Degrading Treatment or Punishment, *see* 8 C.F.R. § 1208.16(d) – 1208.18.  This policy applies at all times following a grant of protection, including during any appellate proceedings and throughout the removal period.

Per the April 21, 2000 and February 9, 2004 Memoranda, the Field Office Director must approve any decision to keep an alien who received a grant of any of the aforementioned protections in custody.  This includes situations where the Office of the Chief Counsel (OCC) is appealing the grant of relief. Additionally, any decision to continue to hold an alien should be done in consultation with the local OCC.

Any questions should be directed to your local OCC.

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message from your system.

3/6/2012

**From:**         ICE Office of the Director
**Sent:**          Mon, 7 Jun 2021 13:41:47 +0000
**To:**            Undisclosed recipients:
**Subject:**      REMINDER: Detention Policy Where an Immigration Judge has Granted Asylum,
Withholding of Removal, or Convention Against Torture Protection, and DHS has Appealed

## A Message from Tae D. Johnson, Acting Director, U.S. Immigration and Customs Enforcement

**To All ICE Employees**
**June 04, 2021**

## REMINDER: Detention Policy Where an Immigration Judge has Granted Asylum, Withholding of Removal, or Convention Against Torture Protection, and DHS has Appealed

On February 9, 2004, then-Assistant Secretary Michael J. Garcia issued U.S. Immigration and Customs Enforcement (ICE) Directive 16004.1, Detention Policy Where an Immigration Judge has Granted Asylum and ICE has Appealed, establishing ICE policy favoring a noncitizen's release in instances in which ICE has appealed the decision of an immigration judge granting asylum, withholding of removal, or protection pursuant to the regulations implementing the Convention Against Torture (CAT protection). I am issuing this reminder to ensure that ICE personnel remain cognizant of and continue to follow this Directive, which supports our commitment to ensuring that our limited detention resources are utilized appropriately.

Pursuant to this longstanding policy, absent exceptional circumstances, such as when the noncitizen presents a national security threat or a danger to the community, or any legal requirement to detain, noncitizens granted asylum, withholding of removal, or CAT protection by an immigration judge should be released pending the outcome of any DHS appeal of that decision.
In considering whether exceptional circumstances exist, prior convictions alone do not necessarily indicate a public safety threat or danger to the community. Rather, the individual facts and circumstances of the case, including extensiveness, seriousness, and recency of the criminal activity, along with any evidence of rehabilitation, should be considered in making such determination.
Consistent with Office of the Principal Legal Advisor (OPLA) policy implementing ICE Directive 16004.1, OPLA attorneys are reminded that, in any detained case in which a noncitizen is granted asylum, withholding of removal, or CAT protection but DHS intends to appeal, Enforcement and Removal Operations (ERO) must be immediately advised of the protection grant so that the noncitizen may be immediately considered for release.

In instances in which a bond was set but not posted by the noncitizen, ERO should conduct a custody redetermination; additionally, "arriving aliens" should be considered for parole. Field

Office Director approval is required to continue detention for those affected noncitizens, and such decisions must be made in consultation with the local OPLA Field Location and appropriately documented.

Questions regarding ICE policy on this issue should be directed to the Office of Policy and Planning at ICEOfficeofPolicy@ice.dhs.gov through the chain of command and Directorate or Program Office leadership. Please note, however, that case-specific questions should be addressed by Directorate or Program Office leadership.


**Tae D. Johnson**
**Acting Director**
**U.S. Immigration and Customs Enforcement**

# EXHIBIT K



**New to X?**

Sign up now to get your own pers

Sign up with G

 Sign up with A

Create accoun

By signing up, you agree to the T
Privacy Policy, including Cookie U

Terms of Service | Privacy Policy |

Accessibility | Ads info | More …

### ICE Flight Monitor
@ICEFlightM

Follow

 Joined August 2025 

**45** Following    **4,953** Followers

| Posts | Replies | Highlights | Media |
| --- | --- | --- | --- |

**ICE Flight Monitor** @ICEFlightM · 11h    ···

A small Journey plane that departed Alexandria, LA landed in Dakar, Senegal at 10:30pm ET.



 1        3      16       557

**ICE Flight Monitor** @ICEFlightM · 4h    ···

Overnight, the Journey plane landed in Benin. This likely marks the fourth deportation flight to Benin, with three flights occurring in 2025.

**Don't miss what's happening**

People on X are the first to know.

Log in    S

New to X?

Sign up now to get your own pers

 Sign up with A

Create accour

By signing up, you agree to the T
Privacy Policy, including Cookie U

Terms of Service  |  Privacy Policy  |
Accessibility  |  Ads info  |  More ···



**ICE Flight Monitor** @ICEFlightM · 38m

After Benin, the Journey plane also landed in Mali.

50

**ICE Flight Monitor** @ICEFlightM · 19h

An ICE Air flight (OAE4060) that departed Alexandria, LA early this morning just landed in Dakar, Senegal. This flight will likely make multiple deportation stops in the region.

1      12      13      1.1K

**ICE Flight Monitor** @ICEFlightM · 12h

UPDATE: The ICE Air flight (OAE4060) just landed in Yaounde, Cameroon. The flight departed Alexandria, LA with a stop in Senegal.

**Don't miss what's happening**
People on X are the first to know.

Log in      S



New to X?

Sign up now to get your own pers

 Sign up with A

Create accoun

By signing up, you agree to the Te
Privacy Policy, including Cookie U

Terms of Service | Privacy Policy |
Accessibility | Ads info | More

ICE Flight Monitor @ICEFlightM · 55m

UPDATE: After stopping in Cameroon, the ICE Air flight (OAE4060) also landed in Ghana and Chad.

Don't miss what's happening

People on X are the first to know.

Log in

New to X?

Sign up now to get your own pers

 Sign up with A

Create accoun

By signing up, you agree to the T
Privacy Policy, including Cookie U

Terms of Service  |  Privacy Policy  |

Accessibility  |  Ads info  |  More ···

Don't miss what's happening

People on X are the first to know.

Log in

S

**New to X?**

Sign up now to get your own pers

 Sign up with A

Create accoun

By signing up, you agree to the T
Privacy Policy, including Cookie U

Terms of Service | Privacy Policy |

Accessibility | Ads info | More ···

**Don't miss what's happening**

People on X are the first to know.

Log in                    S

### New to X?

Sign up now to get your own pers

 Sign up with A

Create accoun

By signing up, you agree to the T
Privacy Policy, including Cookie U

Terms of Service | Privacy Policy |

Accessibility | Ads info | More ⋯

**Don't miss what's happening**

People on X are the first to know.

Log in



**New to X?**

Sign up now to get your own pers...

 Sign up with A...

Create accoun...

By signing up, you agree to the T...
Privacy Policy, including Cookie U...

Terms of Service  |  Privacy Policy  |

Accessibility  |  Ads info  |  More ···

**Don't miss what's happening**

People on X are the first to know.

Log in                    S